MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:      2016 ME 78
Docket:        Cum-15-292
Argued:        February 10, 2016
Decided:       May 26, 2016

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, JABAR, HJELM, and HUMPHREY, JJ.

## TODD A. KILBORN

v.

## NICOLE CAREY et al.

HUMPHREY, J.

[¶1]   This appeal challenges a court's findings and conclusions resulting from its application of the test for establishing de facto parenthood that we enunciated in *Pitts v. Moore*, 2014 ME 59, ¶¶ 27-30, 90 A.3d 1169.   Under the *Pitts* test, "To obtain parental rights as a de facto parent, an individual must show that (1) 'he or she has undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life,' and (2) 'there are exceptional circumstances sufficient to allow the court to interfere with the legal or adoptive parent's rights.'"[1]   *C.L. v. L.L.*, 2015 ME 131, ¶ 20, 125 A.3d 350 (quoting *Pitts*,

---

[1]   On July 1, 2016, the Maine Parentage Act, 19-A M.R.S. §§ 1831-1938, will become effective, and thus it does not apply in this case.  *See* P.L. 2015, ch. 296, §§ A-1, D-1.  However, section 1891 of the Act, entitled "De Facto Parentage," largely codifies our two-part test outlined in *Pitts v. Moore*, 2014 ME 59, ¶¶ 27-30, 90 A.3d 1169, with the exception that the statute will not require a showing of harm or potential harm to the child before a court may grant de facto parentage; it requires only that "[t]he continuing relationship between the person and the child is in the best interest of the child." 19-A M.R.S. § 1891(3)(E) (2015); *see Pitts*, 2014 ME 59, ¶¶ 42-58, 90 A.3d 1169 (Jabar, J., concurring).

2

2014 ME 59, ¶ 27, 90 A.3d 1169.) "[T]he petitioner must make those showings by clear and convincing evidence." *Pitts*, 2014 ME 59, ¶ 27, 90 A.3d 1169.

[¶2]  Nicole Carey appeals from a judgment entered in the District Court (Portland, *Kelly, J.*) finding that Todd A. Kilborn is her daughter's de facto parent. She contends that the court erred in determining that Kilborn met his burden, by clear and convincing evidence, of satisfying both prongs of the *Pitts* test.  We disagree and affirm the judgment.

## I.  BACKGROUND

[¶3]  The court found the following facts after a two-day testimonial hearing, and its findings are supported by competent evidence in the record.  *See Ireland v. Tardiff*, 2014 ME 153, ¶ 1, 107 A.3d 618.

[¶4]  A daughter, now six, was born to Nicole Carey and Benjamin Knight in Massachusetts in February 2010.  The child was hospitalized with a serious illness when she was about a month old, and Knight ended his relationship with Carey and removed himself from his daughter's life during her hospitalization.[2]  Carey moved into Todd Kilborn's home in Maine in April or May 2010, when the child was just two months old.  Carey and Kilborn were married in September 2010.  As part of the wedding ceremony, they included an informal "adoption" ceremony called

---

[2]  The child received social security disability benefits through Knight, but he was otherwise an absentee parent, visiting with his daughter only once between April 2010 and August 2014.

"sprouts and roots," which celebrated their union as a family and held the child out to their family and friends as Kilborn's "adopted" daughter in spirit and intention.

[¶5]  From the beginning of their relationship, Carey made clear to Kilborn that she wanted him to serve as the child's father, and she ushered him into her life in a full parental role.  Kilborn rose to the occasion.  He actively participated in the child's life, including providing day-to-day care such as feeding her, bathing her, and changing her diapers.  Kilborn and Carey discussed formal adoption, but he understood that they could not proceed because the biological father, Knight, was unwilling or unable to consent.  Kilborn and Carey subsequently had two children together, a daughter and a son, and all three children were raised as full siblings.  They shared a family bed until 2013, shortly before the youngest child was born.

[¶6]  Carey's daughter refers to Kilborn as "daddy," and his parents have acted as grandparents to all three children.  Aunts, uncles, and cousins on Kilborn's side were equally the child's aunts, uncles, and cousins and were so named by her.  Kilborn regularly undertook the bedtime routine, which included getting the children into their pajamas, brushing their teeth, reading, and singing, with "Old MacDonald" being a favorite.  He was also responsible for bathtime, and the children usually bathed together.  Kilborn cut back on his work schedule to four days a week in 2011, following the birth of his and Carey's daughter, and to three days a week following the birth of their son, so that he could provide additional

4

childcare. During the weekends, and when he was not at work during the week, Kilborn was fully engaged in taking care of all three children. He also contributed significantly to the household finances, and his income, combined with the Social Security payments received for the child through Knight's disability, were used to run the household.

[¶7] Kilborn's role in the family constellation was nurturing and responsible. He very much enjoyed being a parent to the child and her two siblings and was fully committed to the wellbeing of all three children. Carey personally praised Kilborn's skill, humor, and dependability as a father in her blog, in emails, and on Facebook, writing once, "[a]nother smart move by me—I did hand pick the best father I could have gotten for those young uns."

[¶8] Kilborn and Carey's relationship deteriorated, and, in October 2014, Kilborn filed a complaint for divorce.[3] In his complaint, Kilborn requested that he be declared the de facto father of Carey's daughter, whom he had raised as his own since she was two months old. Carey opposed Kilborn's request and in November 2014 denied him access to the child, though he continued to have visitation with his two biological children. At that time, Carey was also actively

---

[3] When Kilborn filed his complaint for divorce from Carey, Carey brought the child to see Knight at the rehabilitation facility where he was residing. Knight subsequently filed a complaint seeking parental rights to his daughter, and Carey and Knight agreed to entry of judgment allocating shared parental rights and rights of contact. Following the issuance of that judgment, Knight has visited with his daughter once or twice a month.

encouraging and facilitating Knight's reentry into the child's life, notwithstanding his voluntary absence for over four years and the fact that he was living in a residential facility following an alleged suicide attempt.

[¶9]  In a procedural order issued on March 16, 2015, the court, after acknowledging that the process articulated in *Pitts* requires that a person seeking de facto parenthood status must first establish standing to initiate the litigation "by making a prima facie showing of de facto parenthood," *Pitts*, 2014 ME 59, ¶ 35, 90 A.3d 1169, found that Kilborn had made out a prima facie case of de facto parenthood in his affidavit and that, therefore, a separate hearing on the issue of standing was not necessary.[4]

[¶10]  In April 2015, the court held a two-day evidentiary hearing.  Kilborn, Carey, and Knight testified, as well as a child psychologist, the child's former therapist, Kilborn's mother, and several of Carey's friends.  The court found that Kilborn's participation in the child's care was at least as equal to that provided by Carey and sometimes more extensive, and also found that, from the child's infancy until Carey unilaterally denied him access to the child, Kilborn performed substantial caregiving and otherwise undertook a permanent, unequivocal, committed, and responsible role with respect to the child, and did so with the

---

[4]  In its procedural order, the court also required Kilborn to file and serve a separate complaint seeking a determination of de facto parenthood on each biological parent, which he subsequently did on March 25, 2015.

express consent and encouragement of Carey and with Knight's tacit consent and encouragement.

[¶11]  The child's former therapist testified that she had seen the child for twenty-three weekly counseling sessions; that Kilborn had brought her to several of these sessions; that the child would refer to Kilborn as "Daddy"; and that her drawings about her family always included him in the father role.  Based on her work with the child, it was the therapist's opinion that having to watch her younger siblings go off with Kilborn for their visits without her would be extremely difficult for her, and that "there is no doubt that [the child] would be harmed" if Kilborn were removed from her life.

[¶12]  The actual harm that the child suffered was demonstrated by audio recordings entered into evidence in which the child, reacting to Kilborn's arrival to pick up her siblings for a visit, is heard crying, "Daddy, you've got to care about me too" and "I want to come too."  In addition, after four years of positive family unity, the court found that separating the child from her siblings based on her biology, and denying her an ongoing relationship with Kilborn while her siblings were able to enjoy a continued relationship with him, carried a high probability of emotional and psychological harm to her.

[¶13]  The court found that Carey's handling of the transition for the child after separating from Kilborn, including the reintroduction of Knight back into her

life, increased the risk of harm to the child. Carey acknowledged that the child struggled for some period of time following Kilborn's abrupt removal from her life, and she was aware that the child was upset. The therapist expressed a concern about the potential harm to the child caused by rapidly switching father figures, instead of a well thought-out and less abrupt reintroduction of Knight while preserving Kilborn's presence.

[¶14] The court found, by clear and convincing evidence, that the child's life would be substantially and negatively affected by Kilborn's absence and that Kilborn had satisfied his burden of showing that he is the child's de facto parent.

[¶15] The court held a testimonial hearing on June 11, 2015, to determine interim parental rights and responsibilities for Kilborn as to the child. However, before it could enter an order regarding rights of contact and the appointment of a guardian ad litem, Carey filed this appeal and a motion to stay enforcement of the order granting de facto parenthood and "the anticipated order awarding Plaintiff temporary visitation, pending the appeal of both Orders." *See* 14 M.R.S. § 1901 (2015) and M.R. App. P. 2. The court did not act on the motion to stay because of the pending appeal, *see* M.R. App. P. 3(b), and it took no further action on the matter pending the outcome of this appeal.

## II. DISCUSSION

[¶16]  Carey contends that the court erred in determining that Kilborn met his burden, by clear and convincing evidence, of satisfying both prongs of the two-part test set out in *Pitts*, 2014 ME 59, ¶¶ 27-30, 90 A.3d 1169.  We review the court's findings of fact for clear error and its conclusions of law de novo.  *Id.* ¶ 9.

[¶17]  To protect a parent's fundamental right to the care and custody of his or her children, *see Davis v. Anderson*, 2008 ME 125, ¶ 18, 953 A.2d 1166, we have established the standard by which petitions for de facto parenthood must be analyzed.  "To obtain parental rights as a de facto parent, an individual must show that (1) he or she has undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life, and (2) there are exceptional circumstances sufficient to allow the court to interfere with the legal or adoptive parent's rights."  *C.L.*, 2015 ME 131, ¶ 20, 125 A.3d 350 (quotation marks omitted).[5]

A.    Permanent, Unequivocal, Committed, and Responsible Parental Role

[¶18]  We have defined a "permanent, unequivocal, committed, and responsible parental role" as one in which the de facto parent has participated in the child's life as a member of the child's family, has resided with the child, "and,

---

[5]  *See Gordius v. Kelley*, 2016 ME 77, ¶ 18, --- A.3d --- (Saufley, C.J., concurring), for a further discussion of the term "exceptional circumstances."

with the *consent and encouragement of the legal parent*, performs a share of the caretaking functions." *Pitts*, 2014 ME 59, ¶ 28, 90 A.3d 1169 (emphasis added) (quotation marks omitted). More specifically, this standard can be met by demonstrating that the legal parent and the putative de facto parent intended to co-parent, or that a legal parent intended for the nonparent to act in place of the legal parent. *Id.* Carey acknowledges that Kilborn "was a wonderful caregiver for the child," but she argues that, because *Knight* maintained contact with Carey and never gave his consent for Kilborn to assume a "parental role," Kilborn could not establish that he undertook an "unequivocal" parental role in the child's life. *Id.*

[¶19] Contrary to Carey's contention, the court found, and the evidence established, that Carey intended for Kilborn to act as a parent in place of Knight, and further, that Knight had "implicitly, if not explicitly, consented to and encouraged Kilborn's parental role." For example, in her blog, Carey wrote, describing her move to Maine and impending marriage to Kilborn: "So in about a month we will all become a family. At least for formal law-abiding filing purposes. But between you and I, we were a family the moment we pulled in the driveway with our small SUV, crammed with the little amount of life possessions we had on our own." Carey also wrote on social media that she would be "the luckiest" when her "complete family [was] born" upon her marriage to Kilborn, and she testified that she "wanted Kilborn to act as a parent . . . to the child."

10

Kilborn's mother also testified that, right from the beginning, Kilborn was being referred to as Dad, and she was Grammy.

[¶20]  As to Knight's "implicit" consent, he testified that, after he left the child and her mother at the hospital following the child's admission, he allowed Carey to have a different parenting figure in the child's life.  He admitted that he only saw his daughter twice over the course of four years, he was not there for any of her "firsts," and he respected the role that Kilborn played in her life during that time.  The court found that Knight was fully aware of the parental role that Kilborn was playing in the child's life, and that while he did not wish to allow the child to be adopted, he was not opposed to Kilborn effectively serving as her father.

[¶21]  Because there was ample evidence in the record to support the court's finding that Kilborn's parental role was unequivocal, despite Knight's peripheral presence and objection to formal adoption, we conclude that the court did not err in finding that Kilborn met his burden under the first prong of the *Pitts* analysis.[6]

---

[6]  Although Carey argues that a "permissive standard that would enable caretaking to trump biology opens parents to endless litigation from interlopers with seemingly valid legal claims," such as "long-standing day-care providers, relatives, successive sets of stepparents, or close family friends," there are sufficient protections contained within the *Pitts* test to defeat the claims of individuals who have played a lesser role in the children's lives than a de facto parent, and in any event, the evidence clearly establishes that Kilborn is far from being an "interloper" in the child's life.  *See C.L. v. L.L.*, 2015 ME 131, ¶¶ 11-15, 21-22, 125 A.3d 350; *Pitts*, 2014 ME 59, ¶¶ 27-29, 35-37, 90 A.3d 1169.

B.      Exceptional Circumstances and Harm to the Child

[¶22]  We stated in *Pitts* that a court may not constitutionally recognize a person's status as a de facto parent unless the court determines by clear and convincing evidence "that the child's life would be substantially and negatively affected if the person who has undertaken a permanent, unequivocal, committed, and responsible parental role in that child's life is removed from that role." *Id.* ¶ 29.  Carey contends that the trial court erred in concluding that Kilborn carried his burden of establishing that the child would be substantially and negatively affected if Kilborn were removed from her life because the trial court oscillated between concluding that the child was *definitely harmed* by Kilborn's absence and that the child *would possibly be harmed* by Kilborn's absence.

> [¶23]  Here, the court observed that it is not clear, "in practical terms," how
>
> this standard may be met and harm determined.  It remains unclear whether the parties need to obtain expert testimony on the issue, whether the court has the authority to appoint a guardian ad litem for a child . . . and whether the court has authority to preserve the status quo during litigation by providing for continued contact between the child and de facto claimant once the threshold question of standing has been met.

Notwithstanding the reference to a lack of clarity on this issue, the court found that Kilborn had met his burden, giving particular weight to testimony that the child's former therapist would "lose sleep" if she thought the child would be deprived of contact with Kilborn.

12

[¶24]   The court also found compelling the audio recording of the child calling after "Daddy" when he was picking up her siblings but not her, and the fact that the child, who already has a history of anxiety, could be further harmed if Kilborn were removed from her life.  The guardian ad litem for the child's siblings also testified that it is particularly difficult for children close in age to have their family unit separated.  Finally, the court found that the conduct of Carey and Knight, specifically Carey's handling of the transition between Kilborn's departure and Knight's reintroduction, and Knight's earlier pattern of absenting himself almost entirely from the child's life for a period of over four years, were contributory adverse factors in assessing the substantial risk of harm in this case.

[¶25]   While there is some merit to Carey's assertion that the salient questions concern the depth and persistence of the harm, and those questions have no answers without pertinent information regarding the specific child, especially given the lack of jurisprudential or legislative guidance at the time this matter arose, we discern no clear error in the court's findings nor in the court's conclusion that Kilborn met his burden under the second prong of the *Pitts* test.[7]  We conclude

---

[7]  Carey's final argument urges us to overrule the *Pitts* plurality opinion and adopt the requirement of a threat of long-term harm suggested by the dissent.  *Pitts*, 2014 ME 59, ¶¶ 62-63, 90 A.3d 1169 (Levy, J., dissenting).  Because the Legislature has enacted the Maine Parentage Act, which will eliminate any requirement of a showing of harm to the child when determining de facto parentage, adopting a standard of long-term harm would be senseless.  *See* 19-A M.R.S. § 1891(3)(E); *Pitts*, 2014 ME 59, ¶¶ 42-58, 90 A.3d 1169 (Jabar, J., concurring).  Beyond that, the evidence of prospective long-term harm to the child here is of such a magnitude to satisfy even the higher standard described in the *Pitts* dissent that Carey urges us to adopt here.

that it is difficult to envisage a more clear case establishing de facto parenthood and illustrating the proper application of the *Pitts* two-part test than the one before us.

The entry is:

Judgment affirmed.

---

**On the briefs:**

Jamesa J. Drake, Esq., Drake Law, LLC, Auburn, for appellant Nicole Carey

Heather T. Whiting, Esq., and Michael T. Devine, Esq., Drummond & Drummond, LLP, Portland, for appellee Todd A. Kilborn

**At oral argument:**

Jamesa J. Drake, Esq., for appellant Nicole Carey

Heather T. Whiting, Esq., for appellee Todd A. Kilborn

Portland District Court docket number FM-2015-282
FOR CLERK REFERENCE ONLY