MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:       2017 ME 14
Docket:         Kno-16-209
Submitted
  On Briefs:    November 29, 2016
Decided:        January 19, 2017

Panel:          SAUFLEY, C.J., and ALEXANDER, MEAD, JABAR, HJELM, and HUMPHREY, JJ.

TAMMY J. THORNDIKE

v.

JESSICA ANN LISIO

SAUFLEY, C.J.

[¶1]   Jessica Ann Lisio appeals from a judgment of the District Court (Rockland, *Raimondi, J.*) finding that Tammy J. Thorndike is a de facto parent of two of Lisio's biological children.   We discern no error in the court's determinations that Thorndike "has undertaken a permanent, unequivocal, committed, and responsible parental role in [each] child's life," and that "there are exceptional circumstances sufficient to allow the court to interfere with" the biological parents' parental rights.  *Pitts v. Moore*, 2014 ME 59, ¶ 27, 90 A.3d 1169 (quotation marks omitted).  Accordingly, we affirm the judgment.

I.  BACKGROUND

[¶2]  The facts are drawn from the procedural record of the case and the court's supported findings of fact.  *See Kilborn v. Carey*, 2016 ME 78, ¶ 3, 140

2

A.3d 461. Lisio and Thorndike, who lives as a man, met in 2005 when Lisio's son, Caden, was one year old. They began living together in Bath in August 2007. Thorndike was not working at the time because he had suffered a back injury. Lisio was working as a newspaper carrier. Thorndike cared for Caden while Lisio was working. He got the child ready in the morning, delivered him to and from preschool, bathed him, read to him, played with him, took him to medical appointments, and acted in all ways as a loving father to Caden.

[¶3] Thorndike and Lisio decided to have a child together in 2007 or 2008. Lisio arranged to be artificially inseminated, and she became pregnant with Arianna. She and Thorndike registered as domestic partners in early 2009, during the pregnancy. Arianna was born on May 11, 2009.

[¶4] Lisio returned to work about one week after Arianna was born. She began working as a certified nursing assistant and also maintained her paper route. Thorndike was a stay-at-home parent who did all the things a parent does—changing diapers, making bottles, being up at night with the baby, and continuing to take care of Caden. Thorndike also took care of housekeeping chores and attended Arianna's doctor appointments with Lisio. At those appointments, Thorndike presented himself as Arianna's father.

Lisio, Thorndike, and the two children did things together and functioned as a loving family.

[¶5] When Arianna was eight or nine months old, Thorndike and Lisio began having problems in their relationship. Lisio had a brief affair with another person, though the parties remained together and maintained the same parental roles. The couple decided to move to Wiscasset and make a fresh start. Thorndike began to work at a Rockland restaurant during the day, and Lisio, who had stopped delivering newspapers, worked as a CNA at night. Each of them cared for the children while the other was at work. The relationship continued to deteriorate, however, and Thorndike began a relationship with someone else and moved out in 2012.

[¶6] After moving out, Thorndike continued to call the children every day before bedtime, and the children visited him, though the parties disagree about how frequently. By the end of 2012, Lisio had a new boyfriend, Joshua Cote. Cote was working for a carnival and traveled seasonally in New England. Lisio would bring the children and stay with him during weekends. After Cote found out that Thorndike was transgender, Cote demanded that Thorndike pay child support if he wanted to see the children. Thorndike made some payments but did not pay regular child support.

4

[¶7]  During the last week of June 2014, while the children were visiting Thorndike for the weekend, Caden revealed to Thorndike that Cote had been hitting him, and Caden had bruises.  Caden said that Lisio had said not to tell.

[¶8]  Thorndike called his sister and organized a meeting with his parents and Lisio's parents.  At the end of the weekend, the children went to stay with Lisio's parents, consistent with Caden's wishes, and a report was made to the Department of Health and Human Services.  The Department substantiated the report and opened an investigation.  The children remained with Lisio's parents until the end of 2014.

[¶9]  Lisio was very angry with Thorndike for his role in reporting the abuse instead of talking to her about it.  Lisio refused to allow any contact, even by phone, between Thorndike and the children after June 2014, taking the position that Thorndike had no rights.  Thorndike was able to get some clothes to the children through Lisio's mother, but that was the full extent of his contact with the children until the court entered a judgment requiring contact in 2016.

[¶10]  On September 17, 2014, Thorndike filed a complaint for a determination of paternity and parental rights and responsibilities.  Lisio opposed the complaint, arguing that Thorndike had no parental rights.  The

court (*Mathews, M.*) entered a case management order in November 2014 directing that a de facto parentage action complying with the requirements of *Pitts*, 2014 ME 59, ¶ 35, 90 A.3d 1169, must be filed and the complaint served on Caden's biological father. In January 2015, Thorndike moved to amend his complaint to allege de facto parenthood and submitted an affidavit. *See id.*

[¶11] The next month, the court (*Sparaco, J.*) entered an order finding that Caden's biological father had not yet been served and directing the biological parents to submit affidavits within twenty days after the biological father's service. Due to issues of service on Caden's biological father, the court proceeded to address Thorndike's standing in October 2015 without service having been completed. *See id.* The court found that Thorndike had made a prima facie showing of de facto parenthood and therefore had standing. *See id.*

[¶12] Mediation was scheduled, and Caden's biological father was served in Arkansas, where he is incarcerated. Caden's biological father filed a letter with the court in January 2016 opposing Thorndike's claim of de facto parenthood.

[¶13] After mediation, issues of de facto parenthood and the parties' parental rights and responsibilities remained in dispute. The court

(*Raimondi, J.*) held an evidentiary hearing on March 10, 2016. The court heard testimony from Thorndike and his sister, and from Lisio and Cote. The court found, by clear and convincing evidence, that Thorndike was a de facto parent. *See id.* ¶ 36. The court entered a parental rights and responsibilities order that provided for the children's primary residence to be with Lisio, for the parties to share parental rights and responsibilities, for each party to refrain from doing anything to estrange the children from the other party, and for the children to have contact with Thorndike on a gradually increasing schedule that would ultimately place the children in his care every other weekend and one evening every other week. *See id.* ¶ 37.

[¶14] On April 20, 2016, Thorndike filed a motion to correct the findings of fact with respect to the court's reference to a witness as Lisio's sister when she is actually Thorndike's sister. M.R. Civ. P. 52(b), 60(a). On the same day, Lisio filed her timely notice of appeal.

[¶15] After briefs had been filed in this appeal, we directed the court to act on Thorndike's motion to correct. The court granted the motion and corrected the judgment to properly identify the testifying witness as Thorndike's sister. Although the parties were afforded the opportunity to request additional briefing after the ruling on the motion to correct, neither

party made such a request. The judgment remained otherwise unchanged, and we now consider Lisio's appeal.

## II. DISCUSSION

[¶16] The process employed in this case was consistent with the procedures that we outlined in *Pitts*, and neither party argues that there was any procedural defect. *See Pitts*, 2014 ME 59, ¶¶ 34-38, 90 A.3d 1169. Lisio argues only that the court erred in its factual findings and that there is insufficient credible evidence to support the court's determination of Thorndike's de facto parenthood. To review the court's decision, we (A) summarize the law of de facto parenthood and (B) review the court's findings in this case.

A.     Law of De Facto Parenthood

[¶17] The Maine Parentage Act did not take effect until July 1, 2016, after the court had already held a hearing and entered its judgment in this matter. *See* P.L. 2015, ch. 296, §§ A-1, D-1 (effective July 1, 2016) (codified at 19-A M.R.S. §§ 1831-1939 (2016)). Thus, the trial court relied on the case law in effect at the time of the hearing and decision, which required a person seeking to establish de facto parenthood to show, by clear and convincing evidence, that "(1) 'he or she has undertaken a permanent, unequivocal,

8

committed, and responsible parental role in the child's life,' and (2) 'there are exceptional circumstances sufficient to allow the court to interfere with the legal or adoptive parent's rights.'" *C.L. v. L.L.*, 2015 ME 131, ¶ 20, 125 A.3d 350 (quoting *Pitts*, 2014 ME 59, ¶ 27, 90 A.3d 1169). "We review the court's findings of fact for clear error and its conclusions of law de novo." *Kilborn*, 2016 ME 78, ¶ 16, 140 A.3d 461.

[¶18] To satisfy the first element for establishing de facto parenthood, a person must have "participated in the child's life as a member of the child's family . . . reside[d] with the child and, with the consent and encouragement of the legal parent, perform[ed] a share of caretaking functions." *Pitts*, 2014 ME 59, ¶ 28, 90 A.3d 1169 (quotation marks omitted). "Only by establishing that he or she provided some actual caretaking functions can a petitioner be successful." *Id.* The evidence must show "the intent of the legal parent and the putative de facto parent to co-parent, as measured before the dissolution of their relationship, or the intent of the legal parent that the non-parent act as parent in place of the legal parent." *Id.*

[¶19] To satisfy the second element, exceptional circumstances must be established by showing that "'the child's life would be substantially and negatively affected if the person who has undertaken a permanent,

unequivocal, committed, and responsible parental role in that child's life is removed from that role.'" *Kilborn*, 2016 ME 78, ¶ 22, 140 A.3d 461 (quoting *Pitts*, 2014 ME 59, ¶ 29, 90 A.3d 1169 (plurality opinion)).

B.     Review of Court Findings

[¶20]  Although there were a few minor errors in the court's extensive factual findings,[1] the errors are not of the kind that could affect the outcome and are harmless.  *See* M.R. Civ. P. 61.  The court's error in finding that the parties' relationship began earlier than the parties testified that it did may seem significant, but the court found that Thorndike's *parental* role did not begin until August 2007 when Thorndike began to live with Lisio and Caden, and that date is not in dispute.

[¶21]  The other findings that Lisio disputes were not clearly erroneous. Specifically, there is no evidence in the record that Caden's biological father, as Lisio now states, resided with Lisio and Caden until Caden was two years old; there is evidence that Thorndike did not move out of the home until mid-2012; the evidence shows only Lisio's engagement to Cote, not any legal commitment; and even if Lisio is correct that the children have been doing

---

[1]  As Thorndike concedes, the court erred in finding that Lisio received her certified nursing assistant certificate in 2007 and in stating the year of Lisio's affair.  The court also erroneously found that the parties' relationship began immediately when they met in 2005.

well with Lisio and Cote since the Department's involvement, the court did not err in finding that Lisio failed to acknowledge the harm done to the children by denying Thorndike contact after he acted to keep Caden safe from abuse.

[¶22]  The court's findings of fact support its ultimate determinations that (1) Thorndike undertook "a permanent, unequivocal, committed, and responsible parental role" in the children's lives, *Pitts*, 2014 ME 59, ¶ 27, 90 A.3d 1169 (quotation marks omitted), and (2) especially given that Thorndike worked with extended family to prevent child abuse, the children's lives "would be substantially and negatively affected" if Thorndike were removed from his "permanent, unequivocal, committed, and responsible parental role," *Kilborn*, 2016 ME 78, ¶ 22, 140 A.3d 461 (quotation marks omitted).

[¶23]  As the court found, Thorndike and Lisio raised Caden together from age three, became domestic partners, and had Arianna together as a couple.  Thorndike, with Lisio's consent and encouragement, undertook "a permanent, unequivocal, committed, and responsible parental role" in the children's lives, attending to their daily needs and caring for them as a loving parent.  *Pitts*, 2014 ME 59, ¶ 27, 90 A.3d 1169 (quotation marks omitted).  He resided with them until 2012 and after that cared for them at visits and demonstrated a willingness to act decisively when necessary to protect the

children from harm. *See id.* The court did not err in finding that the children's lives "would be substantially and negatively affected" if Thorndike were removed from his parental role. *Kilborn*, 2016 ME 78, ¶ 22, 140 A.3d 461 (quotation marks omitted).

[¶24] The court did not err in finding that both elements set forth in *Pitts* were established by clear and convincing evidence. *See id.*; *Pitts*, 2014 ME 59, ¶¶ 27-29, 90 A.3d 1169. Accordingly, we affirm the court's finding that Thorndike is the de facto parent of Caden and Arianna.

The entry is:

Judgment affirmed.

---

Jessica Ann Lisio, appellant pro se

Timothy J. Kimpton, Esq., Gallagher, Villeneuve and DeGeer, PLLC, Damariscotta, for appellee Tammy J. Thorndike

Rockland District Court docket number FM-2014-200
FOR CLERK'S REFERENCE ONLY