MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2019 ME 152
Docket:        Yor-19-54 and Yor-19-183
Submitted
  On Briefs:   June 26, 2019 and September 10, 2019
Decided:       October 22, 2019

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.


IN RE CHILD OF NICHOLAS P.


HJELM, J.

[¶1]  In this consolidated opinion, we consider two appeals advanced by Nicholas P. in a child protection proceeding in the District Court (Biddeford) involving his child.  In the first appeal, the father challenges the court's (*Sutton, J.*) entry of a jeopardy order against him on grounds that his parentage had not yet been established and that the evidence was insufficient to support the court's finding of an aggravating factor.  In the second appeal, the father asserts that the court (*Duddy, J.*) erred by later entering an order, based on genetic test results but without conducting an evidentiary hearing, adjudicating that he is the child's father.  We affirm both decisions.

## I.  BACKGROUND

[¶2]  The Department of Health and Human Services initiated this child protection proceeding in May of 2018, alleging that the father had neglected the child and exposed the child to violence, had been convicted of assaulting the

mother when she was pregnant with the child, had been substantiated for abusing another child, and had refused to participate in a risk assessment or any treatment for his history of abuse and neglect.[1] *See* 22 M.R.S. § 4032 (2018). The Department did not initially seek a preliminary protection order[2] but did so a month after filing its initial petition. *See* 22 M.R.S. § 4034(1) (2018). The court (*Duddy, J.*) then entered a preliminary protection order placing the child in departmental custody and temporarily relieving the Department of its obligation to furnish rehabilitation and reunification services to the father because of an aggravating factor arising from the father's abuse of the other child.[3] *See* 22 M.R.S. §§ 4002(1-B)(A), 4034(2), (4), 4036(1)(G-2), 4041(2)(A-2)(1) (2018).

---

[1] The child protection proceeding also involves the child's mother. The court (*Sutton, J.*) entered a separate jeopardy order as to the mother with her agreement. She has not appealed from that order and is not a party to the father's appeal. We therefore recount the facts and procedure only as relevant to the father.

[2] When the Department commenced this action, the child was residing with a grandmother.

[3] "If the court's preliminary protection order includes a finding of an aggravating factor, the court may order the department not to commence reunification or to cease reunification . . . ." 22 M.R.S. § 4034(4) (2018); *see* 22 M.R.S. § 4041(2)(A-2)(1) (2018) (allowing the court to enter a cease reunification order at any stage of a proceeding upon finding an aggravating factor). An aggravating factor is defined to include circumstances in which "[t]he parent has subjected any child for whom the parent was responsible to aggravated circumstances, including . . . [r]ape, gross sexual misconduct, gross sexual assault, sexual abuse, incest, aggravated assault, kidnapping, promotion of prostitution, sexual exploitation of a minor, sex trafficking or aggravated sex trafficking, abandonment, torture, chronic abuse or any other treatment that is heinous or abhorrent to society." 22 M.R.S. § 4002(1-B)(A)(1) (2018).

[¶3]  At the summary preliminary hearing held in August of 2018, the father did not challenge the award of custody of the child to the Department but stated to the court that "the purpose of this trial, quite candidly, is to prevent the cease [reunification] from happening."  While testifying during the hearing, the father was asked, "[Y]ou're the father of [this child]?" and the father responded, "Yes."  In the resulting order, the court maintained the Department's custody of the child but found that the Department failed to establish the existence of an aggravating factor.  Accordingly, the court discontinued the cease reunification provision that was contained in the preliminary protection order and instead required that "[r]eunification will move forward for the father."

[¶4]  Two months later, in October of 2018, the court (*Sutton, J.*) commenced a contested jeopardy hearing on the Department's child protection petition.  *See* 22 M.R.S. § 4035 (2018).  Prior to the hearing, the court (*Moskowitz, J.*) had entered a case management order indicating that there were "[n]o paternity issues" in the matter.[4]  The father did not object to the order. Nonetheless, on the morning of the first day of the hearing, the father

---

[4]  Similarly, in a case management order previously entered prior to the summary preliminary hearing, the court (*Duddy, J.*) did not check the box on the form order that would have indicated that parentage was disputed.

asserted—for the first time—that the court lacked "subject matter jurisdiction" to determine jeopardy because his parentage had not been established in accordance with the Maine Parentage Act (MPA), 19-A M.R.S. §§ 1831-1939 (2018). The father requested that the court continue the jeopardy proceeding pending a determination of his parentage. Despite this new position, the father also explicitly took the paradoxical stance that the court should not disturb the summary preliminary order and that the Department should be required to continue providing him reunification services as the child's parent.

[¶5] The court (*Sutton, J.*) sharply rejected the father's argument and denied his request for a continuance. The court characterized the father's argument as "disingenuous" and "nothing more [than] a delay tactic" given that the father had not previously raised the issue of parentage and had, at the summary preliminary hearing, "argu[ed] strenuously against a cease reunification order to a child [whom] he now says he's not the father of or may not be the father of." The court then proceeded to conduct a three-day jeopardy hearing.

[¶6] Based on competent evidence presented at the jeopardy hearing, the court found, by a preponderance of the evidence, that "[the father] is the child's biological father" and that the child is in circumstances of jeopardy to his

health or welfare based on the father's abuse of both the mother and the other child. *See* 22 M.R.S. §§ 4002(6)(A), (10), 4035(2) (2018). The court further found, by a preponderance of the evidence, that the father's abuse of the other child constituted an aggravating factor and, on that basis, again entered a cease reunification order. *See id.* §§ 4002(1-B)(A)(1), 4036(1)(G-2), 4041(2)(A-2)(1).

[¶7] Soon after, the guardian ad litem moved for an order of genetic testing of the father and the child. The court (*Cantara, J.*) granted the motion.[5] *See* 19-A M.R.S. § 1911; 22 M.R.S. §§ 4005-F, 4036(2-A) (2018). Before the genetic testing was conducted, the father filed the first appeal in this matter (the jeopardy appeal), arguing to us that the court erred by adjudicating the issue of jeopardy before his parentage had been established and also challenging the court's finding of an aggravating factor. *See* 22 M.R.S. § 4006 (2018).

[¶8] While the jeopardy appeal was pending, the Department filed a motion with the trial court seeking an adjudication that the father is, in fact, the child's biological parent. *See* 19-A M.R.S. §§ 1851(6), 1904(2), 1915. In support

---

[5] That same day, the Department petitioned to terminate the father's parental rights. The termination petition remains pending as of the date of this opinion.

6

of its motion, the Department submitted a report of the results of the genetic testing the court had previously ordered. The genetic test results revealed, to a 99.99% probability, that the father is the child's biological parent. The Department also filed with us a motion to allow the trial court to act on its motion notwithstanding the pending appeal. *See* M.R. App. P. 3(d). We granted the Department's motion to allow the trial court to act, and the court (*Duddy, J.*) issued an order, based on the genetic test results that had been filed by the Department, adjudicating that the father is a biological parent of the child. The court did not conduct a hearing before adjudicating the father's parentage. The father then instituted a second appeal, challenging the parentage adjudication (the parentage appeal).

[¶9]  We address both appeals.

## II.  DISCUSSION

A.  Parentage Determination: Judicial Estoppel

[¶10]  In the jeopardy appeal, the father challenges the court's jeopardy order primarily on the ground that the court was required to adjudicate that he is a parent of the child before it could consider whether he presents circumstances of jeopardy to the child.[6]

---

[6]  The father also challenges the sufficiency of the evidence supporting the court's finding of an aggravating factor based on the father's abuse of the other child.  The father does not challenge the

[¶11] We note initially that the father has erroneously framed this argument as one that concerns the court's subject matter jurisdiction. "Jurisdiction" is a concept reserved for "delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicative authority." *Landmark Realty v. Leasure*, 2004 ME 85, ¶ 7, 853 A.2d 749 (quotation marks omitted). Subject matter jurisdiction in particular "refers to the power of a particular court to hear the type of case that is then before it." *Jensen v. Jensen*, 2015 ME 105, ¶ 11, 121 A.3d 809 (quotation marks omitted). The power of the District Court to adjudicate a child protection matter is indisputable. *See* 22 M.R.S. § 4031(1)(A) (2018) ("The District Court has jurisdiction over child protection proceedings . . . ."); *In re Austin T.*, 2006 ME 28, ¶ 7, 898 A.2d 946; *see also Adoption of M.A.*, 2007 ME 123, ¶¶ 6-7, 930 A.2d 1088 (concluding that the Probate Court's subject matter jurisdiction was not affected by the asserted procedural issues).

---

court's finding that he had assaulted the other child; he argues only that the Department failed to prove that the child was one "for whom [he] was responsible" pursuant to the statutory definition of "[a]ggravating factor." 22 M.R.S. § 4002(1-B)(A) (2018); *see* 22 M.R.S. § 4002(9) (2018) (defining "[p]erson responsible for the child"); *supra* n.3. The record contains ample evidence to support the court's plenary finding of an aggravating factor, and we do not address the argument further. *See In re E.L.*, 2014 ME 87, ¶ 15, 96 A.3d 691 (applying the clear error standard of review to an aggravating factor finding).

[¶12] Instead, what the father actually argues—although it is not entirely clear—is that the court lacked authority, as a matter of *law*, to consider jeopardy as to him in the absence of a prior parentage adjudication; or that the court's finding in the jeopardy order itself that he is the child's parent is not supported, as a matter of *fact*, by sufficient record evidence; or both. *See In re Children of Shirley T.*, 2019 ME 1, ¶ 19 n.9, 199 A.3d 221 (stating that we review the court's underlying factual findings for clear error and address issues of law de novo); *see also* 22 M.R.S. § 4002(7) (2018) (defining a "[p]arent" as "a natural or adoptive parent or a parent established under [the MPA], unless parental rights have been terminated").

[¶13] Neither argument is persuasive.

[¶14] First, the child protection statutes make clear that jeopardy proceedings are not dependent on parentage status,[7] and the father has offered

---

[7] The Child and Family Services and Child Protection Act, 22 M.R.S. §§ 4001 to 4099-H (2018), which encompasses jeopardy proceedings, applies to parents as well as to certain nonparents. *E.g.*, *id.* § 4033(3-A) (stating that a preliminary protection order may remove a child from the "parents, legal guardian or custodians"); *id.* § 4034(3), (4) (allowing a child's "parent, custodian or legal guardian" to waive the right to a summary preliminary hearing and consent to a preliminary protection order); *id.* § 4034(4) (stating that the court's role in the summary preliminary hearing is to discern whether "returning the child to the child's custodian would place the child in immediate risk of serious harm"); *id.* § 4035(2-A) (creating a rebuttable presumption of jeopardy for the actions of a "person seeking custody or contact with the child" or a "parent or person responsible for the child"); *id.* § 4036(1)(C) (stating that, in a child protection order, the court may require "[t]hat the child, the custodians, the parents and other appropriate family members accept treatment or services to ameliorate the circumstances related to jeopardy"); *id.* § 4036(1)(F) (providing that the court may order the removal of the child "from his custodian" in a jeopardy order); *see also id.* § 4002(9-C) (defining "[r]emoval of the child from home" to include the home of "the parent, legal guardian or

no authority—from the child protection statutes or elsewhere—to support his contention that an affirmative adjudication of parentage (or other relevant nonparent status) is necessary before a court may undertake the jeopardy proceedings. Rather, a determination that the person is someone against whom the court may issue a jeopardy order may be based on evidence presented at the jeopardy hearing itself. *See* 22 M.R.S. § 4035(1), (2)(A), (B) (providing that the court "shall make a fresh determination of the question of jeopardy" based on evidence admitted at the jeopardy hearing and "shall make findings of fact on the record upon which the jeopardy determination is made").

[¶15] As to the court's finding in the jeopardy order that the father is the child's parent, the court concluded, in essence, that the father was judicially estopped from asserting that he is not the child's parent or insisting that the Department prove his parentage. The court's conclusion was correct.

[¶16] Judicial estoppel applies when

> (1) the position asserted in the subsequent legal action [is] clearly inconsistent with a previous position asserted; (2) the party in the previous action [has] successfully convinced the court to accept the inconsistent position; and (3) the party [has] gain[ed] an unfair advantage as a result of [his or her] change of position in the subsequent action.

---

custodian"); *id.* §§ 4032(2)(G), 4034(5) (affording "parents and custodians" the right to counsel in a child protection proceeding).

*Linnehan Leasing v. State Tax Assessor*, 2006 ME 33, ¶ 25, 898 A.2d 408. The doctrine rests on the principle that, after a party successfully asserts one position during a legal proceeding, that party is barred from asserting a contrary position at a later stage of the proceeding. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). In this way, judicial estoppel "prohibit[s] parties from deliberately changing positions according to the exigencies of the moment." *Id.* at 750 (quotation marks omitted); *see Me. Educ. Ass'n v. Me. Cmty. Coll. Sys. Bd. of Trs.*, 2007 ME 70, ¶¶ 16-17, 923 A.2d 914.

[¶17]   Throughout the proceedings leading up to the jeopardy determination, the father consistently and explicitly maintained that he is the child's father, and he sought and sometimes obtained relief in the form of rehabilitation and reunification services based solely on his status as the child's parent.[8]  This is revealed in a number of aspects of the summary preliminary hearing process:

- In a case management order entered prior to the hearing, the father did not challenge the court's indication that paternity was not disputed;

---

[8] Although rehabilitation and reunification services may be available to certain individuals other than parents, such as a child's custodian, *see* 22 M.R.S. § 4036(1)(C), in this matter, the father has never asserted—to the District Court or to us—that he is entitled to receive reunification services on any basis other than his status as the child's parent.  Rather, at every turn leading up to the jeopardy hearing, he has relied on his parentage, and the record contains no suggestion that the father's involvement in this proceeding is as anything other than a parent.

- At the hearing, the father testified, *under oath*, that he is the child's father;

- The father did not challenge the Department caseworker's testimony that he is the child's father;

- The father, during his attorney's cross-examination of the Department caseworker, referred to himself as the child's parent when asking, "And so at the onset of this case . . . , it was the Department's plan to reunify both *parents*" (emphasis added);

- The father stated on the record that he requested a hearing for the express purpose of challenging only the cease reunification provision in the preliminary protection order, thereby arguing to the court that he should receive the benefit of rehabilitation and reunification services as the child's parent, *see* 22 M.R.S. §§ 4002(1-B), 4034(4), 4041 (2018); and

- The father opposed the court's finding of an aggravating factor, which is defined only "with regard to *the parent*," on the ground that the evidence of his abuse of the other child was not credible, but without asserting that the Department failed to prove that he was "the parent" at issue, *id.* § 4002(1-B) (emphasis added).

[¶18]  The father's efforts at the summary preliminary hearing were successful; the court found that the Department did not prove the existence of an aggravating factor and ordered the Department to commence rehabilitation and reunification efforts for the father.

[¶19]  It was not until the morning of the first day of the jeopardy hearing—almost five months after the child protection petition was filed—that the father first asserted that the matter could not proceed unless and until his parentage was established, this despite his successful assertion of rights as the

child's father just nine weeks earlier at the summary preliminary hearing. Additionally, even during the jeopardy phase of the case, the father continued to hold himself out as the child's father in other respects:

- He did not object to a case management order entered by the court prior to the jeopardy hearing, in which the court stated that there were "[n]o paternity issues" in the matter;

- He argued at the jeopardy hearing that the court should not vacate the summary preliminary order, which required the Department to provide him with services that would allow him to reunify parentally with the child;

- He argued at the jeopardy hearing that the court should not allow the Department to cease reunification efforts for him, and, on cross-examination, he challenged the recommendation that the Department cease reunification services for him;

- In his written closing argument for the jeopardy hearing, he argued that the Department "failed to meet its burden of proving an aggravating factor justifying continuing the Cease Reunification"; and

- As at the summary preliminary hearing, he opposed the finding of an aggravating factor by contesting the allegation that he abused the other child and by asserting that he was not a "person responsible for the child," but he did not argue that there was insufficient evidence to prove the "parent" element necessary for finding an aggravating factor, *id.*

[¶20] Significantly, the father has *never* denied that he is the child's biological parent, and he has *never* asserted that he has evidence to suggest that some other person is the child's biological father. Instead, he has argued only that the Department was required to prove his parentage, despite his own

admissions of parentage and his reliance on the fact of his parentage as a predicate to the relief he has sought at multiple stages of this child protection proceeding.  With good reason, it was apparent to the court that the father's last-minute nominal challenge to his parentage was an unwarranted about-face that would delay the jeopardy hearing beyond the statutory deadline;[9] unfairly disadvantage the Department in the litigation; and otherwise groundlessly impede the progression of this case, which involves the safety of a child.

[¶21]  We agree with the court's conclusion that all three prerequisites for the application of judicial estoppel are present, and the father is therefore barred from advancing any challenge to his parentage in this proceeding.  *See New Hampshire*, 532 U.S. at 755-56; *Me. Educ. Ass'n*, 2007 ME 70, ¶ 20, 923 A.2d 914; *Linnehan Leasing*, 2006 ME 33, ¶ 25, 898 A.2d 408.  Because the father was estopped from arguing to the trial court that the jeopardy hearing could not proceed in the absence of a parentage finding, the court committed no error by denying the father's request to continue the jeopardy proceedings on that basis.[10]

---

[9]  Pursuant to 22 M.R.S. § 4035(4-A), "[t]he court shall issue a jeopardy order within 120 days of the filing of the child protection petition."

[10]  In the end, there can be no uncertainty about the father's parentage because, for the reasons we discuss below, he has since been affirmatively and properly adjudicated to be the father.  *See* 19-A M.R.S. §§ 1851(6), 1904(1)(A), 1915(1)(A)(2) (2018); *supra* ¶ 8; *infra* ¶¶ 31-40.

14

[¶22] The estoppel effect goes further because it also precludes the father from arguing in the jeopardy appeal that the trial court erred by finding jeopardy without first finding from the evidence that he is the child's father.

[¶23] Judicial estoppel also applies to the father's parentage appeal, despite the father's assertion that it does not foreclose his challenge to the parentage adjudication in particular. More specifically, the father contends that genetic parentage can only be established when certain scientific and documentary criteria are met,[11] *see* 19-A M.R.S. §§ 1851(6), 1902-1904, 1915, and therefore it can never be established by testimony alone. This means, according to the father, that he cannot be judicially estopped from challenging genetic parentage based on his conduct in the case, including his prior testimony.

---

[11] Curiously, and in a way that demonstrates the frailty of his position, the father rests his contention entirely on his analysis of only one of the ways to become a parent pursuant to the MPA— genetic parentage—when in fact the MPA recognizes *fifteen* different ways to become a parent: (1) by admitting to parentage in a pleading or under oath, 19-A M.R.S. § 1841 (2018); (2) by default, 19-A M.R.S. § 1842 (2018); (3) by implication, 19-A M.R.S. § 1844(2) (2018); (4) by affording full faith and credit to a determination of parentage from another state, 19-A M.R.S. § 1845 (2018); (5) by birth, 19-A M.R.S. § 1851(1) (2018); (6) by adoption, 19-A M.R.S. § 1851(2) (2018); *see* 18-A M.R.S. §§ 9-101 to 9-404 (2018); (7) by a recorded acknowledgement of paternity, 19-A M.R.S. §§ 1851(3), 1861-1873 (2018); (8) by presumption, 19-A M.R.S. §§ 1851(4), 1881-1883 (2018); (9) by an adjudication of de facto parentage, 19-A M.R.S. §§ 1851(5), 1891 (2018); (10) by an adjudication of parentage based on genetic testing, 19-A M.R.S. §§ 1851(6), 1901-1915 (2018); (11) as a result of a refusal to submit to genetic testing ordered by the court, *id.* § 1914(1); (12) through assisted reproduction as to a spouse, 19-A M.R.S. §§ 1851(7), 1922(2)(A) (2018); (13) through assisted reproduction with a written agreement, 19-A M.R.S. §§ 1851(7), 1922(2)(B) (2018); (14) through assisted reproduction after a lab error, 19-A M.R.S. §§ 1851(7), 1929 (2018); and (15) through a gestational carrier agreement, 19-A M.R.S. §§ 1851(8), 1931-1939 (2018).

[¶24]  The father's argument falls short of the mark in two respects.  First, it is directly contradicted by the MPA, which expressly recognizes circumstances in which a party to a genetic parentage dispute may be "estop[ped] . . . from denying parentage" based on his or her conduct.  *Id.* § 1912(1)(A).

[¶25]  Second, the father's argument conflates the requirements of proof when proof is necessary, with circumstances in which no proof is required in the first place because the putative parent, through his or her conduct during the judicial proceeding, becomes barred from denying parentage.  *See New Hampshire*, 532 U.S. at 755-56; *Me. Educ. Ass'n*, 2007 ME 70, ¶¶ 16, 20, 923 A.2d 914.  In the latter situation, judicial estoppel obviates any need to evaluate the scientific or other evidence of parentage that would otherwise be examined according to the applicable proof requirements in the MPA.  Instead, judicial estoppel precludes the father from challenging parentage in any way given his prior conduct in the case, including his successful reliance on his own assertions of parentage to obtain relief at the summary preliminary hearing.  The father is therefore estopped from arguing in the parentage appeal that the court erred by failing to follow a particular process in making its affirmative determination of parentage.

16

B.     Parentage Determination on the Department's Motion: The MPA

[¶26]  Although, for the reasons we have just explained, the father is judicially estopped from denying his parentage to the child, we nonetheless take this opportunity to examine the MPA and reach his challenge to the affirmative, evidence-based determination that he is, in fact, the child's parent. Before doing so, however, we address a threshold issue regarding the justiciability of the parentage appeal.

1.     Justiciability of the Parentage Appeal

[¶27]  Although neither party has raised the question of the justiciability of the issues raised in the father's parentage appeal, we consider the question sua sponte. *See Chretien v. Chretien*, 2017 ME 192, ¶ 5 n.3, 170 A.3d 260.

[¶28]  Pursuant to 22 M.R.S. § 4006, only three types of orders may be appealed in child protection matters: a jeopardy order, a judgment terminating parental rights, and a medical treatment order.  Any other Title 22 order is not justiciable.  22 M.R.S. § 4006; *In re L.R.*, 2014 ME 95, ¶¶ 5-9, 97 A.3d 602; *In re B.C.*, 2012 ME 140, ¶¶ 12-14, 58 A.3d 1118.  This presents the question of whether a parentage determination entered in a child protection action can be properly appealed.

[¶29] As we have recognized, an order entered in the *context* of a child protection case, but which is not *itself* an order entered pursuant to the Child and Family Services and Child Protection Act, 22 M.R.S. §§ 4001 to 4099-H (2018), may be cognizable on appeal despite the limitations created by section 4006. *See In re Children of Shirley T.*, 2019 ME 1, ¶¶ 1, 15 n.6, 199 A.3d 221 (reviewing on the merits the denial of a motion to transfer jurisdiction of a child protection matter to a tribal court pursuant to the Indian Child Welfare Act of 1978, 25 U.S.C.S. §§ 1901-1963 (LEXIS through Pub. L. No. 116-56)); *In re Jacob C.*, 2009 ME 10, ¶¶ 10-14, 965 A.2d 47 (agreeing to consider an appeal from a Title 19-A parental rights and responsibilities judgment issued in the context of a Title 22 child protection proceeding). A parentage determination, even when it is part of a child protection proceeding, *see* 22 M.R.S. §§ 4005-F, 4036(2-A); *see also* 19-A M.R.S. § 1834(3), is not governed by Title 22 but rather by the MPA. The father's parentage appeal is therefore justiciable because it is from a final judgment that was entered pursuant to the MPA and is not itself a Title 22 order. *See* 14 M.R.S. § 1901 (2018) (stating that appeals from District Court decisions may be taken to the Law Court); 19-A M.R.S. § 104 (2018) (providing for appeals of District Court decisions entered pursuant to Title 19-A); 19-A M.R.S. § 1844(4) ("A party to an adjudication of parentage may challenge

18

the adjudication only by appeal or in a manner otherwise consistent with the Maine Rules of Civil Procedure.").

[¶30] We therefore proceed to the substance of the father's contentions in the parentage appeal.

2.      Merits of the Parentage Appeal

[¶31] In the parentage appeal, the father challenges the parentage determination, which is based on genetic testing, by asserting only that the court erred by adjudicating his parentage without first conducting a hearing. The father points to no specific provision of the MPA that mandates an evidentiary hearing, but he instead infers such a requirement from 19-A M.R.S. § 1913, which provides for the "admissibility" of genetic test results as evidence of parentage. From that, the father also suggests that, because the MPA prescribes scientific and documentary criteria that must be met before a court may rely on genetic test results, a hearing was necessary to allow cross-examination in order to challenge or otherwise test compliance with those requirements.

[¶32] Whether the MPA mandates the trial court to conduct a hearing before adjudicating genetic parentage requires us to interpret the MPA de novo, which we do by first examining its plain language. *See Guardianship of*

*Patricia S.*, 2019 ME 23, ¶ 12, 202 A.3d 532. If the statute is unambiguous, we consider the statute according to its plain meaning. *See id.* Only if the statute is ambiguous—which, for the reasons that follow, we conclude it is not—would we then consider other indicia of legislative intent, such as the legislative history leading to the MPA's enactment. *See id*.

[¶33]  A genetic test result is not, by itself, an enforceable and final judicial determination of parentage. 19-A M.R.S. §§ 1851(6), 1904(2). Rather, a person who is identified as a parent in a genetic test result that complies with statutory requirements is "rebuttably identified as the genetic parent of [the] child." *Id.* § 1904(1); *see id.* § 1902. Parentage is then judicially determined only after the court enters an adjudication based on that genetic test result. *Id.* § 1851(6) ("Parentage may be established by . . . [a]n adjudication of genetic parentage under subchapter 6."); *id.* § 1904(2) ("Identification of a genetic parent through genetic testing does not establish parentage absent adjudication under this chapter."). The court's obligation to enter an adjudication based on genetic test results is circumscribed: if a genetic test result meets statutory scientific requirements, *id.* §§ 1902, 1904; is described in a report that provides certain specified information, *id.* § 1903; and identifies

a person as the parent, the court "shall find that person to be the genetic parent and may adjudicate the person as the child's parent," *id.* § 1915(1)(A)(2).

[¶34]   When there is some legitimate question asserted about the reliability of the genetic test results, the MPA sets out the process for rebutting the identification of a person as a biological parent and for admitting other evidence that bears on a genetically-based parentage adjudication.   Those statutorily prescribed procedures include the following elements.

- "[A] record of a genetic testing expert is admissible as evidence of the truth of the facts asserted in the report unless a party objects to its admission within 14 days after its receipt by the objecting party and cites specific grounds for exclusion."  *Id.* § 1913(1).

- A rebuttably identified genetic parent "may rebut the genetic testing results," although "only by other genetic testing" that either excludes that person as the parent or identifies another person as the possible genetic father.  *Id.* § 1904(3).

- "A party objecting to the results of genetic testing may call one or more genetic testing experts to testify in person or by telephone, videoconference, deposition or another method approved by the court."  *Id.* § 1913(2).

- "Testimony relating to sexual relations or possible sexual relations of the woman giving birth at a time other than the probable time of conception of the child is inadmissible in evidence."  *Id.* § 1915(2).

- "In a proceeding to adjudicate parentage, the court may . . . deny admissibility of the test results at trial if the court determines that . . . [t]he conduct of the parties estops a party from denying parentage [or] [i]t would be an inequitable interference to the relationship between the

child and a parent or otherwise contrary to the best interest of the child." *Id.* § 1912(1).

- "A report made under the requirements of this subchapter is self-authenticating"; if the testing laboratory documentation establishes a reliable chain of custody, the genetic test results are "admissible without testimony." *Id.* § 1903(2).

[¶35]  Despite the references to admissibility and testimony in these provisions, the MPA does not require a hearing as a predicate to an adjudication of parentage.  The relevant provisions of the MPA instead contemplate that an adjudication can be issued based on genetic test results alone, which are self-authenticating.  *Id.*  A party who seeks to challenge those results is required to file a timely objection to the test results within fourteen days after receipt of the test results and, in that objection, he or she must state the "specific grounds" for contesting the genetic test results.  *Id.* § 1913(1).  If a putative parent files such an objection, a hearing likely is necessary because a "rebuttably identified" parent may, for example, rebut his genetic identification as a parent with proper evidence of contradictory test results, *id.* § 1904(1), (3), or may seek to discredit the results by presenting competing genetic testing expert testimony, *id.* § 1913(2).  Therefore, although a hearing may constitute the best practice in many instances, the MPA does not contain a provision requiring the court to hold a contested hearing for *all* adjudications of genetic parentage, nor would

such a requirement be an efficient means of resolving a dispute in the face of uncontroverted scientific proof.[12]

[¶36] If a hearing were categorically required in every parentage dispute, there would be little reason for the Legislature to have imposed this discrete statutory process requiring a putative parent to affirmatively object to genetic test results and, in that objection, articulate the particular basis for a challenge. *See Sears, Roebuck & Co. v. State Tax Assessor*, 2012 ME 110, ¶ 8, 52 A.3d 941 ("A statute should be interpreted to avoid surplusage, which occurs when a construction of one provision of a statute renders another provision unnecessary or without meaning or force." (quotation marks omitted)). The objection procedure instead allows a party the opportunity to create a further factual record, but that process is triggered only when the party has an evidentiary basis on which to rebut the genetic test results and describes that basis with specificity in the objection. 19-A M.R.S. §§ 1904(3), 1913(1).

---

[12] When the Legislature requires a hearing in a matter, it is fully capable of saying so, including in Title 19-A matters, and even within the MPA itself. *See, e.g.*, 19-A M.R.S. § 1891(2)(C) ("The court may in its sole discretion, if necessary and on an expedited basis, hold a hearing to determine disputed facts that are necessary and material to the issue of standing [to seek de facto parenthood]."); 19-A M.R.S. § 2009(6) (2018) ("If a downward deviation is proposed, the court shall hold a hearing prior to entering [a child support ] order."); *see also* 15 M.R.S. § 106(3) (2018) ("[T]he court shall conduct a hearing within 30 days of the filing of [a] motion [for involuntary medication] . . . ."); 18-C M.R.S. § 5-319(2) (2018) ("The court shall conduct a hearing to determine whether termination or modification of a guardianship of an adult is appropriate . . . ."); 22 M.R.S. § 4054 ("The court shall hold a hearing prior to making a termination [of parental rights] order."). The Legislature has enacted no similar provision with regard to genetic parentage adjudications.

[¶37]   The conclusion that a hearing is not always needed for an adjudication of parentage is also consistent with portions of the MPA that govern parentage adjudications other than by genetic testing.  For example, parentage may be established by an admission in a pleading.  *Id.* § 1841(1).  If "there is no reason to question the admission, and no other party contests it, the court may issue an order adjudicating the child to be the child of the person admitting parentage."[13]  *Id.* § 1841(2).  Like the genetic parentage provisions, section 1841 places the obligation on the objecting party to initiate proceedings necessary to resolve a factual dispute.  In the absence of an assertion that there exists a legitimate factual dispute, the pleading alone is a sufficient basis for adjudicating parentage.

[¶38]  Additionally, an acknowledgement of paternity that is signed and recorded with the State Registrar of Vital Statistics is "equivalent to an adjudication of parentage."  *Id.* § 1865(1).  That statutory acknowledgement process allows an adjudication of parentage in the absence of a hearing, even though an effective acknowledgement of paternity—like a genetic test result—

---

[13]   Parentage also may be established by testimony under oath to that effect.  19-A M.R.S. § 1841(1).  Given the father's testimonial admission of parentage during the summary preliminary hearing and the absence of any subsequently obtained evidence calling his parentage into question, the court could well have adjudicated parentage pursuant to section 1841(1), thus obviating the need for any genetic testing or application of the doctrine of judicial estoppel.

must satisfy a list of statutory requirements. *Id.* § 1862. Also, a party may be adjudicated to be a parent without a hearing or any input at all if he or she fails to submit to court-ordered genetic testing. *Id.* § 1914(1). Even the de facto parentage statute, which requires the petitioning parent to meet threshold fact-based standing criteria, requires the court to hold a hearing only when, in the court's "sole discretion," a hearing is necessary "to determine disputed facts that are necessary and material to the issue of standing." *Id.* § 1891(2)(C); *cf. Young v. King*, 2019 ME 78, ¶¶ 11-13, 208 A.3d 762 (concluding that a hearing was required to resolve the conflicting facts as to de facto parenthood standing that had been properly presented by the parties).

[¶39] These examples demonstrate that, although parentage *may* be determined by genetic testing that implicates underlying scientific statutory criteria that, in turn, *could* provide fodder for challenging genetic test results in a fact-finding setting, a hearing on the matter is not always required. In multiple settings governed by the MPA, a person may be adjudicated a parent in the absence of any kind of hearing. The Legislature has not differentiated a parentage determination based on genetic testing from those approaches. Additionally, as a more general matter, a court is given great latitude in determining whether a hearing is necessary, even when a motion is based on a

factual predicate. *See* M.R. Civ. P. 43(e) ("When a motion is based on facts not appearing of record the court may hear the matter on affidavits presented by the respective parties, but the court may direct that the matter be heard wholly or partly on oral testimony or depositions."); *Randall v. Conley*, 2010 ME 68, ¶¶ 18-19, 2 A.3d 328 ("We review the court's decision not to hear testimony only for abuse of discretion." (quotation marks omitted)).

[¶40]  We conclude that the MPA plainly and unambiguously does not require a testimonial hearing in every case before a court may properly adjudicate parentage based on a genetic test result.[14]  Here, despite the opportunity allowed by section 1913, the father did not object to or challenge

---

[14]  Even if we were to conclude that the MPA reveals some measure of ambiguity on the point, which would allow us to resort to legislative history, *see Guardianship of Patricia S.*, 2019 ME 23, ¶ 12, 202 A.3d 532, the result would be the same.  In a report of the Family Law Advisory Commission, on whose recommendations the MPA was enacted, it was recommended that an adjudication of parentage based on a party's admission or by default should not require a hearing.  Family Law Advisory Comm'n, Report to the Joint Standing Comm. on Judiciary app. B at 3 (Dec. 2014); *see* P.L. 2015, ch. 296, §§ A-1 to D-1 (effective July 1, 2016); L.D. 1017, Summary (127th Legis. 2015).  It would be absurd to interpret the genetic parentage provisions, which are based on *scientific* evidence of parentage, to suggest that genetic test results are less reliable than an admission or default.  *See Urrutia v. Interstate Brands Int'l*, 2018 ME 24, ¶ 12, 179 A.3d 312.

Moreover, comments to the Uniform Parentage Act, on which the MPA is also based, establish that genetic test results were intended to be decisive in a parentage dispute: "This section establishes the controlling supremacy of admissible genetic test results in the adjudication of paternity."  Unif. Parentage Act § 631 cmt. (Nat'l Conference of Comm'rs on Unif. State Laws 2002); *see* L.D. 1017, Summary (127th Legis. 2015).  Although "errors (and sometimes fraud) may occur in testing," which could require "other evidence of paternity [to be] presented in the proceeding," genetic testing otherwise "can be absolute"; "if test results are admissible, those results control unless other test results create a conflict rebutting the admitted results."  Unif. Parentage Act § 631 cmt.  These comments support an interpretation of the MPA that genetic test results that comply with the scientific requirements of the statute are dispositive—without the need for a hearing—absent a timely objection and rebutting evidence.

the genetic test results. Rather, the father objected to the motion only on the grounds that the District Court lacked jurisdiction to adjudicate parentage while an appeal was pending and that the District Court should vacate its jeopardy order and allow the parties to litigate parentage along with jeopardy in a new hearing; he did not argue that the genetic test results themselves were flawed. It is also significant to note that the father has never substantively drawn the test results into question in any other way; he has never asserted that the testing process did not meet the scientific or documentary criteria set out by statute, *see* 19-A M.R.S. §§ 1902-1904, or that the genetic test results—which establish a 99.99% probability of his paternity—are unreliable for some other reason. In the absence of any such challenge articulated in a proper objection, and having been presented with self-authenticating test results, the court was not obligated to conduct a hearing. *See id.* § 1903(1). We therefore identify no error in the court's adjudication of the father's parentage without having conducted a hearing.

C.    Conclusion

[¶41] None of the father's challenges to the court's orders is persuasive. Given the stance the father had taken in this action up to the moment the jeopardy hearing began, the court appropriately determined that the father was

judicially estopped from challenging his parentage of the child or the Department's obligation to prove his parentage. Later, after the court was presented with the results of a court-ordered genetic test demonstrating the father's parentage—and without the father's statutorily sufficient objection to that report—the court did not err by adjudicating his parentage without holding a hearing.

The entry is:

Judgments affirmed.

---

Scott M. Houde, Esq., Biddeford, for appellant father

Aaron M. Frey, Attorney General, and Meghan Szylvian, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee Department of Health and Human Services

Biddeford District Court docket number PC-2018-24
FOR CLERK REFERENCE ONLY