MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2019 ME 78
Docket:        Cum-18-325
Argued:        February 6, 2019
Decided:       May 21, 2019

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.
Majority:      SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.
Concurrence:JABAR, J., and SAUFLEY, C.J.

JASON YOUNG

v.

TONI M. KING

MEAD, J.

[¶1]    Jason Young appeals from a judgment of the District Court (Portland, *Cashman, J.*) dismissing, for lack of standing, his complaint seeking to be determined a de facto parent of Toni M. King's adopted child. *See* 19-A M.R.S. § 1891(2) (2018).   Young argues that the court abused its discretion in declining to hold a hearing to determine disputed facts and in concluding that King's refusal to allow Young to adopt the child was dispositive of the issue of whether King understood, acknowledged, or accepted that, or behaved as though, Young was a parent to the child.   *See* 19-A M.R.S. § 1891(3)(C) (2018). We clarify the process, vacate the judgment, and remand for further proceedings.

## I. BACKGROUND

[¶2]  The court stated in its judgment that, for purposes of its standing determination, it accepted the statements contained in the affidavits that Young submitted on the question of standing.[1]  Except where indicated otherwise, the following facts are drawn from those affidavits and from the procedural record.

[¶3]  Young and King began dating in 2004.  In 2005, the couple purchased a house together in Limerick, and King, as a single prospective adoptive parent, applied to adopt a child through an adoption agency.  Young and King had decided to adopt together but were told by the adoption agency that although they would be identified as a couple in internal documents, his name could not be mentioned in international documents because many countries required potential adoptive parents to either be a single woman or an established married couple.  The plan, according to Young, was for him to adopt the child after King first adopted the child as a single parent.

[¶4] In 2007, King accepted a referral to adopt a six-month-old child from India.  In February 2008, the couple travelled to India to bring the child back to their home in Limerick.  King adopted the child in December 2008 but then told Young that she was not going to allow him to also adopt the child.  Nevertheless,

---

[1] As noted below, many of Young's averments of material facts are sharply contradicted in King's affidavits.

the three continued to live in their home until November 2011. King agrees in her affidavit that, during that time, Young played with the child, cooked for the family, and transported the child to and from daycare. Young avers that he was involved in raising the child in many other ways, including contributing to the child's healthcare by paying for her chiropractic appointments out of pocket, to the child's daycare by giving King a check every month to cover half of the costs, and to the child's participation in certain activities by enrolling the child in gymnastics camp, inter alia.

[¶5] King at some point began dating a new partner, and in November 2011, she and the child moved into King's new partner's home, which is located approximately 150 miles from Limerick. Young remained in the Limerick house and kept the child's bedroom there intact, leaving most of her belongings, including her cat, at the house. For several years following the move, the child generally spent every other weekend with Young at the Limerick house, as well as some time during school vacations and summers. In March 2016, when the Limerick house was sold, Young purchased a new house that included a bedroom for the child. By April 2018, Young's opportunities for visitation with the child had become increasingly inconsistent, and he brought

4

a complaint for a determination of parentage, parental rights, and responsibilities.

[¶6] King moved to dismiss Young's complaint for lack of standing to be determined a de facto parent. Based on the filings, the court agreed and dismissed Young's complaint for lack of standing. The court found that because King did not allow Young to adopt the child and did not otherwise regard Young as the child's father, Young failed to show that King understood, acknowledged, or accepted Young as a co-parent, and Young therefore lacked standing to seek an adjudication of de facto parenthood. Young moved for reconsideration on the issue of standing and for a hearing, which the court denied, again finding that had King behaved as though Young were the child's father she would have allowed him to become an adoptive parent. Young appeals. *See* 14 M.R.S. § 1901(1) (2018); 19-A M.R.S. § 104 (2018); M.R. App. P. 2A.

## II. DISCUSSION

[¶7] Young argues that the court erred by determining that he failed to establish standing. The court made its standing determination pursuant to the de facto parentage framework prescribed in the Maine Parentage Act (MPA), *see* 19-A M.R.S. § 1891(3) (2018). "We examine the legal aspects of a court's standing determination de novo and review for clear error the factual findings

underlying that determination." *Lamkin v. Lamkin*, 2018 ME 76, ¶ 10, 186 A.3d 1276.

[¶8]  Pursuant to the MPA, "a party who files a complaint to be adjudicated a de facto parent of a child must make an initial showing of standing that will determine whether the court will hold a plenary hearing on the ultimate question of whether that person is a de facto parent." *Davis v. McGuire*, 2018 ME 72, ¶ 13, 186 A.3d 837; *see* 19-A M.R.S. § 1891(2).  To demonstrate standing, the claimant must satisfy, by a preponderance of the evidence, the statutory elements laid out in section 1891(3) of the MPA.  *See Davis*, 2018 ME 72, ¶¶ 15, 26, 186 A.3d 837.  The standing determination is a multi-step process.  *Id.* ¶ 15.

> First, the claimant is required to file an affidavit along with the complaint, stating "specific facts" that track the elements of a de facto parenthood claim.  [19-A M.R.S.] § 1891(2)(A). Next, the adverse party may file a responsive affidavit along with a responsive pleading.  *Id.* § 1891(2)(B).  Finally, the court is to review the parties' submissions and either make a determination based on the parties' submissions whether the claimant has demonstrated standing, or, "in its sole discretion, if necessary and on an expedited basis, hold a hearing to determine disputed facts that are necessary and material to the issue of standing."  *Id.* § 1891(2)(C).

*Id.*  The claimant has the burden to present persuasive evidence of the elements of standing—meaning that the proof must be by a

6

preponderance—"irrespective of whether the court adjudicates the issue based on the papers or on evidence presented at a hearing." *Id.* ¶¶ 19, 24, 26. The required elements are that

> A. The person has resided with the child for a significant period of time;
>
> B. The person has engaged in consistent caretaking of the child;
>
> C. A bonded and dependent relationship has been established between the child and the person, the relationship was fostered or supported by another parent of the child and the person and the other parent have understood, acknowledged or accepted that or behaved as though the person is a parent of the child;
>
> D. The person has accepted full and permanent responsibilities as a parent of the child without expectation of financial compensation; and
>
> E. The continuing relationship between the person and the child is in the best interest of the child.

19-A M.R.S. § 1891(3)(A)-(E).[2]  In this case, the court founded its conclusion that Young lacked standing on its determination that Young could not show that King acknowledged that he was a parent because she did not allow him to adopt the child. *See id.* § 1891(3)(C).

---

[2]  In our decisions preceding enactment of the MPA "we held that, in order to establish the compelling state interest needed to justify governmental interference with a parent-child relationship, the [claimant] must prove the existence of 'exceptional circumstances.'" *Davis v. McGuire*, 2018 ME 72, ¶ 15 n.7, 186 A.3d 837.  We noted in *Davis* that because the statutory elements found in 19-A M.R.S. § 1891(3) (2018) do not include this requirement, there remains a question as to "whether proof of the elements alone is a constitutionally adequate foundation for a de facto parenthood determination." *Id.*  As in *Davis*, we need not reach that question in this matter because the preliminary standing issue has not yet been properly determined.  *See id.*

[¶9]  On the facts presented, the court's treatment of the single fact of King's refusal to allow Young to adopt as dispositive in the standing analysis constitutes an error of law.  We have recognized that a legal parent can refuse to allow a claimant to adopt a child yet still consent to the parental role that the claimant has played in the child's life.  For example, in *Kilborn v. Carey*, we reasoned that a legal parent "implicitly, if not explicitly, consented to and encouraged [a claimant]'s parental role" when the legal parent "admitted that he only saw his daughter twice over the course of four years, he was not there for many of her firsts, and he respected the role that [the claimant] played in her life during that time."  2016 ME 78, ¶¶ 19-20, 140 A.3d 461 (quotation marks omitted).  Even though "he did not wish to allow the child to be adopted, he was not opposed to [the claimant] effectively serving as her father." *Id.* ¶ 20. We held that this evidence established that the legal parent intended for the claimant to be a parent to the child "despite [the legal parent]'s peripheral presence and objection to formal adoption." *Id.* ¶ 21.

[¶10] Although Young concedes that King did not allow him to adopt the child, that does not necessarily mean that she did not otherwise understand, acknowledge, or accept that "a bonded and dependent relationship has been established between" the child and Young, or behave as though Young was a

parent to the child. 19-A M.R.S. § 1891(3)(C); *see also* American Law Institute, *Principles of the Law of Family Dissolution* § 2.03, cmt. c (2002) ("Failure to adopt the child when it would have been possible is some evidence, although not dispositive, that the legal parent did not agree to the formation of the de facto parent relationship."). To determine whether Young presented persuasive evidence of the statutory requirements, the court was therefore required to review all of the facts proffered by the parties in their affidavits that were material to the issue of standing. *See* 19-A M.R.S. § 1891(2)(C).

[¶11] Given that many of the other facts material to the issue of standing were contested by the parties and that, if believed, Young's version of the facts could have led to a finding that he had standing, the court should have held a hearing to determine those disputed facts. As we have stated, the court acts within its discretion by declining to hold a hearing on standing when the assertions in the petitioner's affidavits, even if accepted as true, could not support a conclusion that the petitioner has standing. *Davis*, 2018 ME 72, ¶ 26 n.9, 186 A.3d 837. This means that, as is true here, where the standing determination will rest on the resolution of material facts that the parties have disputed in their affidavits, a hearing will be necessary to allow the court to

hear from witnesses and evaluate evidence in order to adjudicate those contested facts.[3]

[¶12] Thus, although the decision of whether to conduct an evidentiary hearing on the issue of standing is within the sole discretion of the court, *see* 19-A M.R.S. § 1891(2)(C), the conflicting facts presented by the parties' affidavits created bona fide issues of material fact relating to whether King "behaved as though [Young] is a parent of the child." *Id.* § 1891(3)(C). *Cf. In re Estate of Wright*, 637 A.2d 106, 109 (Me. 1994) (stating that "the allowance of attorney fees and costs rests within the sole discretion of the Probate Court" and that "[t]he general standard of reviewing a Probate Court's decision on a request for fees . . . is the 'abuse of discretion' standard" (quotation marks omitted)); *Most v. Most*, 477 A.2d 250, 260 (Me. 1984) ("The decision whether to hold a hearing is reviewable on appeal only for an abuse of discretion."). For example, Young claims in his affidavit that King allowed the child to call him "Dad" or "Daddy," King purchased Father's Day cards for the child to give to Young, and King allowed others in the community, such as the child's daycare provider, to understand Young to be the child's father. *See*

---

[3] We emphasize that the mere existence of disputed facts in the affidavits of the parties is insufficient to justify an evidentiary hearing; the disputed facts must be necessary and material to the issue of standing before a hearing is convened pursuant to 19-A M.R.S. § 1891(2)(C).

19-A M.R.S. § 1891(2)(A). Resolution of these contested facts—and any other disputed facts material to the issue of standing—is necessary in this case.

[¶13] On remand, if, after holding an evidentiary hearing, the court concludes that Young has established standing, Young must still prove a de facto parent relationship by clear and convincing evidence at a plenary hearing, *see id.* § 1891(3); *Davis*, 2018 ME 72, ¶ 26, 186 A.3d 837.[4] Requiring a preliminary hearing on the issue of standing where, as here, material facts are contested appropriately balances our recognition that parental rights disputes can be heavily factbound and that "[t]he facts are often infused with nuances and coated with an emotional overlay," *Kinter v. Nichols*, 1999 ME 11, ¶ 7, 722 A.2d 1274, with our concern for infringement on the fundamental right to parent, *see Davis*, 2018 ME 72, ¶ 14, 186 A.3d 837.

---

[4] The court may convene a single consolidated hearing addressing both standing and de facto parenthood after consideration of (1) the relative complexity of the factual issues of standing and de facto parenthood; (2) the time and expense involved in conducting separate hearings on those subjects; and (3) the benefits and burdens upon the parties—including the disruption, caused by the de facto parentage proceeding, of the legal parent's constitutionally protected relationship with the child, *see Davis*, 2018 ME 72, ¶ 14, 186 A.3d 837—that would be presented by separate hearings as opposed to a single hearing that addresses both subjects.

At such a consolidated hearing, the court must first adjudicate the question of standing by applying the preponderance standard of proof. If standing is established, the court may then proceed to adjudicate the merits of the de facto parentage petition by applying the standard of clear and convincing evidence. Competent evidence admitted in conjunction with the standing determination may be considered, to the extent that it is relevant, in the adjudication of the merits of the petition.

The entry is:

> Judgment vacated. Remanded for an evidentiary
> hearing.

---

JABAR, J., with whom SAUFLEY, C.J., joins, concurring.

[¶14] We concur with the Court's opinion remanding the case to the trial court, but we do not agree that it is necessary for the trial court to conduct a hearing on the issue of standing. The record in this matter already establishes sufficient undisputed facts constituting prima facie evidence of standing and allow the court to reach the merits. Requiring a full hearing on standing, on this record, will simply result in more costs for all parties.

[¶15] The de facto parentage section of the Maine Parentage Act (MPA) sets out the procedure that a court must follow when a person seeks to be adjudicated a de facto parent. *See* 19-A M.R.S. § 1891 (2018). The procedure begins with a determination of standing pursuant to § 1891(2)(A)-(D),[5] which consists of a multi-step process.

---

[5] In order to establish standing pursuant to 19-A M.R.S. § 1891(2) (2018), the Legislature has enacted the following process:

> A. A person seeking to be adjudicated a de facto parent of a child shall file with the initial pleadings an affidavit alleging under oath specific facts to support the existence of a de facto parent relationship with the child as set forth in subsection 3. The pleadings and affidavit must be served upon all parents and legal guardians of the child and any other party to the proceeding.

12

[¶16] First the claimant is required to file an affidavit with the complaint seeking de facto parentage alleging under oath "specific facts" that track the elements of a de facto parent relationship. *Id*. § 1891(2)(A). Next, an adverse party may file a response to the putative de facto parent's pleading and affidavit. *Id*. § 1891(2)(B). Then, pursuant to § 1891(2)(C), the court must review the parties' submissions and determine whether the putative de facto parent has presented prima facie evidence of the requirements set forth in § 1891(3)(A)-(E).[6]

---

B. An adverse party, parent or legal guardian who files a pleading in response to the pleadings in paragraph A shall also file an affidavit in response, serving all parties to the proceeding with a copy.

C. The court shall determine on the basis of the pleadings and affidavits under paragraphs A and B whether the person seeking to be adjudicated a de facto parent has presented prima facie evidence of the requirements set forth in subsection 3. The court may in its sole discretion, if necessary and on an expedited basis, hold a hearing to determine disputed facts that are necessary and material to the issue of standing.

D. If the court's determination under paragraph C is in the affirmative, the party claiming de facto parentage has standing to proceed to adjudication under subsection 3.

[6] 19-A M.R.S. § 1891(3)(A)-(E) sets forth the following requirement:
[T]hat the person has fully and completely undertaken a permanent, unequivocal, committed and responsible parental role in the child's life. Such a finding requires a determination by the court that:

A: The person has resided with the child for a significant period of time;

B: The person has engaged in consistent caretaking of the child;

C: A bonded and dependent relationship has been established between the child and the person, the relationship was fostered or supported by another parent of the child and the person and the other parent have understood,

[¶17]   "Prima facie evidence requires only some evidence on every element of proof necessary to obtain the desired remedy [or judgment]." *Camden Nat'l Bank v. Weintraub*, 2016 ME 101, ¶ 11, 143 A.3d 788 (quotation marks omitted); *Cookson v. State*, 2014 ME 24, ¶ 16, 86 A.3d 1186. "[P]rima facie proof is a low standard that does not depend on the reliability or the credibility of evidence, all of which may be considered at some later time in the process." *Weintraub,* 2016 ME 101, ¶ 11, 143 A.3d 788 (quotation marks omitted).  Thus, "prima facie evidence" requires only some evidence on every element of proof necessary to establish standing to seek a de facto parentage claim as set out in § 1891(3).

[¶18]   If the presented evidence is uncontested, then the court must accept the evidence as true and determine whether the uncontested evidence constitutes prima facie evidence of the statutory elements laid out in § 1891(3) of the MPA.  *See* 19-A M.R.S. § 1891(2)(C); *see also Weintraub,* 2016 ME 101, ¶¶ 11-17, 143 A.3d 788; *Nader v. Me. Democratic Party*, 2012 ME 57, ¶¶ 33-35,

---

acknowledged or accepted that or behaved as though the person is a parent of the child;

D: The person has accepted full and permanent responsibilities as a parent of the child without expectation of financial compensation; and

E: The continuing relationship between the person and the child is in the best interest of the child.

41 A.3d 551. If there are competing affidavits, then the court must determine whether there are undisputed facts contained within the competing affidavits that constitute prima facie evidence of the required elements under § 1891(3). *See* 19-A M.R.S. § 1891(2)(C). Absent undisputed facts that are sufficient to constitute prima facie evidence, the court must hold a hearing to consider the disputed facts that are necessary and material to the issue of standing. *See Marie v. Renner*, 2008 ME 73, ¶¶ 3-10, 946 A.2d 418 (holding that an evidentiary hearing was required before the trial court could rule on a motion to enforce); *Seacoast Hangar Condo. II Ass'n v. Martel*, 2001 ME 112, ¶ 28, 775 A.2d 1166 ("The court erred in determining, without conducting an evidentiary hearing to resolve the factual issues in dispute . . . . We remand for such a hearing."); *State v. Willoughby*, 532 A.2d 1020, 1024 (Me. 1987) ("The receipt of testimony is an essential aspect of a court's hearing and resolving of legal disputes.").

[¶19] Although the parties' affidavits do contain disputed facts, they also contain many undisputed facts concerning the relationship between Young and the child. The *undisputed* facts establish the following narrative:

[¶20] When King traveled to India to pick up her adopted daughter, Young traveled with her. *See* 19-A M.R.S. § 1891(3)(C). Young signed a "father

figure" letter on paperwork associated with the adoption. *See id.* § 1891(3)(C)-(D). Upon returning from India with the child, Young and King lived together in a jointly-owned house in Limerick, Maine. *See id.* § 1891(3)(A), (C). During the three years in Limerick, when the parties lived together, Young took part in the child's day-to-day caretaking duties, including sharing diaper changing duties with King, reading stories to the child before bedtime, frequently making meals for the family, helping the child with daily hygiene such as brushing her hair and teeth, and picking up the child from day care once a week—where he was listed as the child's father. *See id.* § 1891(B)-(D).

[¶21] Between February 2008 and April 2011—the time when King left the household and moved to Hampden—the child called Young "Daddy" and sent Young cards from day care referring to him as her daddy. *See id.* § 1891(3)(C), (E). The child continued to send Young Father's Day and birthday cards as recently as January 13, 2018. *See id.* § 1891(3)(C), (E).

[¶22] When King moved to Hampden with the child, who was 5-years-old at the time, she and Young worked out a visitation schedule where Young would have visitation with the child every other weekend. *See id.* § 1891(3)(A)-(D). Under this arrangement, Young traveled a distance of

approximately 150 miles each way to pick up the child on Thursday and drop her off on Sunday. *See id*. § 1891(3)(A)-(D). For the first four years of this visitation schedule, when the child was with Young on the weekends and during extended visits, the child lived in the same house and in the same bedroom where she had spent the first three years of her adopted life in Limerick. Young had maintained the child's bedroom and took care of the child's cat following his split with King. *See id*. § 1891(3)(B)-(D). When Young moved to Portland following the sale of the Limerick house in 2016, he maintained a bedroom for the child and continued to care for her cat. *See id*. § 1891(3)(B)-(D).

[¶23] The visitation scheduled continued religiously for seven years, *see id*. § 1891(3)(A)-(D), until King unilaterally stopped visitation in April 2018. Up until April 2018, the child referred to Young as her father; in a birthday card sent from the child to Young on January 13, 2018, the child wrote: "Happy birthday to a dad I love and a dad I will always love and I will never stop loving you DaD because I LOVE YOU SO MUCH." *See id*. § 1891(C), (E).

[¶24] Notwithstanding the presence of disputed facts, the above narrative of undisputed facts constitute sufficient prima facie evidence of all of the elements contained in § 1891(3). The focus must be on the relationship between Young and the child, not on the relationship between King and Young.

It is undisputed that Young, King, and the child lived together as a family in Limerick, and the child considered Young to be her father. After King moved to Hampden with the child, this relationship continued. The seven years of visitation present in this case is no different than the relationship that is commonplace with divorce cases. There is no dispute that the child considered Young to be "Daddy" during those many years. For these reasons, Young has presented prima facie evidence to establish standing to bring a de facto parentage claim.

[¶25] Standing is a preliminary hurdle that putative de facto parents must overcome to get their day in court where they must prove by clear and convincing evidence the elements pursuant to § 1891(3). Under the statute, a finding of standing in no way establishes those elements; it is simply a gatekeeping function to ensure that only legitimate cases of de facto parenthood proceed. After satisfying the standing requirement, the putative de facto parent must prove by clear and convincing evidence the necessary elements under § 1891(3).

[¶26] At this juncture of the case, the undisputed facts present a legitimate claim of de facto parentage. There is no need for a hearing on this

preliminary matter.  We would remand for a hearing on the merits of Young's

petition for de facto parentage.  19-A M.R.S. § 1891(3)-(4).

_____

Timothy E. Robbins, Esq. (orally), South Portland, for appellant Jason Young

Audrey B. Braccio, Esq. (orally), Pelletier & Faircloth LLC, Bangor, for appellee
Toni M. King

Portland District Court docket number FM-2018-445
FOR CLERK REFERENCE ONLY