MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:       2021 ME 62
Docket:         Sag-21-18
Argued:         July 13, 2021
Decided:        December 14, 2021

Panel:          MEAD, GORMAN, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.

## MARK R. MARTIN

v.

## MARYLOU E. MACMAHAN

HORTON, J.

[¶1]  Mark R. Martin appeals from judgments entered by the District Court (West Bath, *Raimondi, J.*) establishing Dawn and James Ostrander as de facto parents of two biological children of Martin and Marylou E. MacMahan; allocating parental rights and responsibilities and child support among Martin, MacMahan, and the Ostranders; and amending an existing divorce judgment between Martin and MacMahan.[1]  Martin argues that that the court misapplied the legal standards governing de facto parentage and made findings that were not supported by evidence in the record, including by adopting a magistrate's findings in an interim order.  We affirm the judgment establishing de facto parentage, parental rights and responsibilities, and child support, but we vacate

---

[1]  We consolidated Martin's appeals under the caption for the divorce matter.

2

the judgment amending the divorce judgment because it is inconsistent with the judgment establishing parental rights and responsibilities, and we remand so that the inconsistency can be corrected.

## I.  BACKGROUND

[¶2]  The following facts and procedure are drawn from the procedural record and findings made by the court that are supported by evidence admitted at the final hearing.[2]  *See Kilborn v. Carey*, 2016 ME 78, ¶¶ 3, 16, 140 A.3d 461. Martin and MacMahan are the biological parents of twins born in March 2014. When the children were born, Martin and MacMahan lived in Arrowsic and did not have a vehicle.  Dawn Ostrander, MacMahan's lifelong friend, drove MacMahan to prenatal care appointments, drove the children home from the hospital after they were born, and drove MacMahan and the children to subsequent checkups.  The Ostranders helped care for the children and supplied the necessities of care, such as diapers, wipes, formula, and clothing.

[¶3]  When the children were about four months old, Martin moved the family to Kansas, believing—incorrectly—that he would have housing and employment there.  In Kansas, after staying a week with Martin's mother and

---

[2]  The facts recited here do not include those that the court adopted from the magistrate's interim order without corroborative evidentiary support from the final hearing.  *See infra* ¶ 20.

grandmother, the family moved to a motel and then started living out of a car. While they were still in the motel, Martin began shoplifting DVDs to make money. He was arrested in December 2014 and spent about a week in jail. After his release from jail, his criminal case was resolved and he was placed on probation until October 2015. He has generally remained in Kansas since then.

[¶4] When Martin went to jail, MacMahan and the children had no money, housing, or means of transportation. Desperate, MacMahan called Dawn Ostrander, who drove to Kansas, brought MacMahan and the children back to Maine, and helped MacMahan find a place to live. The Ostranders resumed providing MacMahan with the necessities of care for the children, including diapers, wipes, formula, clothing, bassinets, and car seats.

[¶5] At first, the children stayed with the Ostranders on weekends and for some overnights during the week. By April 2016, the children were living primarily with the Ostranders, who provided for all aspects of their care. Martin did not provide any support for the children during this time. On several occasions between 2015 and early 2017, MacMahan, who was homeless at times, told Martin that she needed help and asked him to come get the children. He responded that he could not. In April 2016, when the children had just turned two years old, the Ostranders began providing full-time care for them at

the request of a community organization concerned about MacMahan's lack of stable housing, and, with limited exceptions, the children have resided with the Ostranders full-time ever since. Dawn Ostrander has enrolled both children in speech therapy and has transported them to those sessions for several years.

[¶6] In June 2017, Martin came to Maine, believing that he had an agreement with MacMahan that he would take custody of the children for some period of time. When he arrived, MacMahan did not permit him to see the children. Martin initiated a divorce action against MacMahan and then returned to Kansas. Martin returned to Maine for a visit around Christmas in 2017; it was the first time he had seen the children since being arrested in Kansas in December 2014.

[¶7] In an agreed-upon divorce judgment issued in January 2018, a Family Law Magistrate (*Kidman, M.*) awarded shared parental rights to MacMahan and Martin, granted primary residence to MacMahan, and set a contact schedule that included a two-month visit with Martin in Kansas during the summer of 2018. Meanwhile, although the children were spending some weekends at MacMahan's home, they were otherwise living with the Ostranders. In April 2018, the Ostranders obtained a protection from abuse

order against MacMahan on behalf of the children.[3]  When Martin found out about the protection order,[4] he contacted the Ostranders, gave them temporary legal authority over the children, and told them he would come to get the children in June.  Martin then moved to modify the divorce judgment, seeking primary residence and sole parental rights.

[¶8]  In June 2018, after the Ostranders filed petitions seeking guardianship of the children, a Family Law Magistrate (*Adamson, M.*) held a combined interim evidentiary hearing on Martin's motion to modify the divorce judgment and the Ostranders' guardianship petitions.  The magistrate then issued an interim order in which she made extensive findings and set forth detailed arrangements for the children's visit with Martin in Kansas, including that they were "to be returned to [Maine] according to the [divorce] [j]udgment . . . on August 17, 2018"[5] and that they were to be allowed to have contact with the Ostranders while they were with Martin.  The magistrate declined to

---

[3]  The protection order, which prohibited MacMahan from having any contact with the children, was based on the children's report to the Ostranders of inappropriate behavior toward them by a member of MacMahan's household.  The protection order was dismissed in May 2019 on the Ostranders' motion after MacMahan had ended her relationship with the person in question.

[4]  Martin later testified that the father of MacMahan's other children called him in April 2018 and told him about the protection order and that this was when he first became aware that the children had been living with the Ostranders.

[5]  According to the divorce judgment, Martin was to provide for the children's transportation to Kansas; MacMahan was to provide for their transportation back to Maine.

6

otherwise modify the divorce judgment and issued no decision regarding the Ostranders' guardianship petitions.[6]

[¶9] Martin did not return the children to Maine in August 2018. He also did not comply with the interim order's requirement that he allow the Ostranders to have contact with the children three times per week. In late October 2018, after the Ostranders notified the court that they had not been allowed to speak with the children for eight days, the court (*Dobson, J.*) held a hearing and then authorized the Ostranders to pick up the children in Kansas as soon as possible.

[¶10] The Ostranders drove to Kansas to pick up the children on November 1, 2018; when they arrived, Martin told them they could not take the children until noon the next day. They slept in their car that night before returning to Maine with the children. The children have resided with the Ostranders ever since.

[¶11] Martin saw the children for Christmas in 2018 and then for two weeks in Kansas in the summer of 2019. He speaks with the children on the

---

[6] With respect to the guardianship petitions, however, the magistrate noted that "while [Martin] may be capable of caring for the children during [the summer 2018] visit, a strong bond has developed between the[] children and the [Ostranders], who have provided for their care for three years. [The Ostranders] are the only caregivers [the children] have truly known. The . . . [children] were delayed socially and developmentally when entering [the Ostranders'] care and have since flourished and received medical and other therapeutic care. It would jeopardize the [children's] well-being to break this bond out of anger or spite."

phone and over video chat. A court order would have permitted a visit in Kansas during the summer of 2020, but restrictions related to the COVID-19 pandemic made that difficult. Martin suggested, in the alternative, that he would come to Maine for a week-long visit, but after planning to do so, he canceled the arrangements.

[¶12] Since 2016, the Ostranders have received a total of $100 in financial support from Martin and $85 in financial support from MacMahan, and they have received no state or federal financial aid in caring for the children. According to the children's teachers, the children are doing well socially and academically, and the Ostranders are active and concerned caretakers. The teachers have not had any contact with either Martin or MacMahan. Martin agreed, during his testimony, that he never reached out to the children's teachers or health care providers because he "relied on [the Ostranders] to keep [him] up to date on those things" and because he was "relying on them to [exercise] the parental responsibilities for [his] children."

[¶13] After returning to Maine with the children in November 2018, the Ostranders filed a complaint and affidavit seeking a determination of de facto parentage, parental rights and responsibilities, and child support. With the agreement of the parties, the court found in May 2019 that the Ostranders had

8

demonstrated standing to proceed with the de facto parentage action. *See* 19-A M.R.S. § 1891(2) (2021); *see also, e.g.*, *Libby v. Estabrook*, 2020 ME 71, ¶¶ 13-14, 234 A.3d 197.

[¶14] The court (*Raimondi, J.*) held a final, consolidated hearing on the Ostranders' guardianship petitions, their de facto parentage complaint, and Martin's motion to modify the divorce judgment. Over the course of two days in September 2020, it heard testimony from, among other people, Martin, MacMahan, the Ostranders, and the guardian ad litem. The court then issued an order addressing both the Ostranders' parentage complaint and Martin's motion to modify the divorce judgment.[7] The order incorporated extensive findings, which the court set forth in a separate document. In the middle of a section of that document titled "FACTUAL HISTORY," the court referred to findings expressed by the magistrate in the June 2018 interim order and stated: "After consideration of the evidence presented to this court at the hearing in this matter, the court adopts those findings." The court then restated, verbatim, many of the findings expressed in the June 2018 interim order.

[¶15] In another section of the court's order titled "LEGAL ANALYSIS," the court made additional findings specifically related to the elements of the

---

[7] The court dismissed the Ostranders' guardianship petitions as moot.

Ostranders' de facto parentage claim, *see* 19-A M.R.S. § 1891(3) (2021), and concluded that the Ostranders had met their burden to prove, by clear and convincing evidence, that they are de facto parents of the children. Specifically, the court made the following findings:

- The children have had regular contact with the Ostranders for their entire lives and have resided primarily with the Ostranders since 2016, *see* 19-A M.R.S. § 1891(3)(A);

- The Ostranders have engaged in caretaking for the children since before the children were born, consistently providing emotional, financial, educational, and medical support for the children on a day-to-day basis, *see* 19-A M.R.S. § 1891(3)(B);

- The Ostranders have provided the only stable parenting the children have known, and the children are deeply bonded to them, *see* 19-A M.R.S. § 1891(3)(C);

- The Ostranders have accepted responsibility for the children without expecting compensation, *see* 19-A M.R.S. § 1891(3)(D); and

- Remaining with the Ostranders is in the children's best interests, *see* 19-A M.R.S. § 1891(3)(E).

The court also found that "MacMahan does not dispute that she fostered and supported the relationship between the Ostranders and the children." As to Martin, the court found that he knew, by no later than April 2018, that the children had been living with the Ostranders; that before then he either knew or "turned a blind eye and chose not to know"; and that he had "abdicated his

financial and personal responsibility to care for the children and . . . continues to do so."

[¶16]  Addressing parental rights and responsibilities, the court ordered, inter alia, that the children's primary residence would be with the Ostranders and that parental rights would be shared among the Ostranders, Martin, and MacMahan, with the Ostranders having final decision-making authority. Accordingly, the court denied Martin's motion to modify the divorce judgment, declining to grant him sole parental rights and primary residence.  Finally, the court issued a child support order and amended some of the divorce judgment's provisions—including those for child support and for contact between Martin and the children—to render the divorce judgment consistent with the judgment setting forth parental rights and responsibilities and child support.[8]

[¶17]  Without first moving for amended or additional findings, *cf.* M.R. Civ. P. 52(b); *Davis v. McGuire*, 2018 ME 72, ¶ 2 n.2, 186 A.3d 837, Martin filed this timely appeal.  *See* 14 M.R.S. § 1901 (2021); M.R. App. P. 2B(c)(1).

---

[8]  The court made clear that its intent was to amend the divorce judgment to make it consistent with the judgment establishing de facto parentage, parental rights and responsibilities, and child support.  But although the judgment establishing parental rights and responsibilities provides that the children's primary residence shall be with the Ostranders and awards specified rights of contact to Martin and MacMahan, the court did not amend the divorce judgment's conflicting provision that the children's primary residence shall be with MacMahan.  We therefore vacate the amended divorce judgment and remand the matter to enable the court to resolve the conflict.  *See infra* ¶ 36.

## II. DISCUSSION

### A.    Adoption of Interim Findings

[¶18]  Martin first argues that the court erred by incorporating findings from the interim order into its final judgment.  He relies primarily on 4 M.R.S. § 183(1)(E) (2021), which provides that "[i]nterim orders . . . are subject to de novo review by a judge at the final hearing," and M.R. Civ. P. 110A(b)(7), which provides that "[a]n interim order does not constitute the law of the case, and the issues may be decided de novo at the final hearing."  Although the statute and rule both touch on the effect of a magistrate's interim order, neither governs the precise issue here, which is the proper treatment of specific *findings* in an interim order by a court issuing a final judgment.  Here, the court held a two-day final hearing before adjudicating, in its final judgment, Martin's motion to modify the divorce judgment and the Ostranders' parentage action.[9]

[¶19]  Although the court stated that it was "adopt[ing]" the magistrate's findings, it also explained that it was doing so "[a]fter consideration of the evidence presented to this court at the hearing in this matter."  On the record before us, we are satisfied that the court viewed the evidence presented at the final hearing as supporting the findings that the magistrate had made based on

---

[9]  The magistrate had not addressed the Ostranders' parentage petition at all; that petition was not filed until after the magistrate issued the interim order.

the testimony presented at the interim hearing.[10]  Martin contends otherwise, but he did not ask the trial court to clarify its statement, reconsider its findings, or alter or amend its judgment.  *See Adoption by Jessica M.*, 2020 ME 118, ¶ 16, 239 A.3d 633 ("The appellant bears the burden of providing an adequate record upon which the reviewing court can consider the arguments on appeal." (quotation marks omitted)); *cf.* M.R. Civ. P. 52(b); 59(e).

[¶20]  We agree with Martin that one of the court's findings was clearly erroneous because there was no evidence admitted at the final hearing to support the finding that a caseworker concluded that Martin had neglected the children before the family moved to Kansas.  Ultimately, however, the error was harmless.  Contrary to Martin's suggestion, the vast majority of the "adopt[ed]" findings were independently supported by competent evidence admitted at the final hearing, including the crucial finding that, before April 2018, "if [Martin] was unaware that the [children] were not in [MacMahan's] direct care, it is because he turned a blind eye to the dire situation here in Maine."  *See infra* ¶¶ 32-33.  The court expressed that finding—along with the other findings

---

[10]  The Ostranders do not argue that the court could have adopted the interim findings pursuant to M.R. Civ. P. 118(a)(2), which provides for review by the court of a magistrate's *final* order or judgment, or that the court could have taken judicial notice of the interim findings, *see* M.R. Evid. 201(b); *Adoption by Jessica M.*, 2020 ME 118, ¶ 14, 239 A.3d 633; *In re Scott S.*, 2001 ME 114, ¶¶ 12-14, 775 A.2d 1144.

central to its de facto parentage determination, *see* 19-A M.R.S. § 1891(3)—in a separate portion of the judgment without reference to the stray, unsupported finding concerning the caseworker's observations.  In the context of the court's entire order, it is highly probable that the erroneous finding did not affect Martin's substantial rights.  *See* M.R. Civ. P. 61; *In re Scott S.*, 2001 ME 114, ¶ 25, 775 A.2d 1144; *see also Banks v. Leary*, 2019 ME 89, ¶¶ 15, 18, 209 A.3d 109 (highlighting a "court's limited reliance on" an erroneously admitted guardian ad litem report to conclude that harmless error applied).

## B.     De Facto Parentage

[¶21]  Martin argues that, because the trial court did not find that he affirmatively fostered and supported the Ostranders' de facto parent relationship with the children, we would need to interpret the de facto parentage statute unconstitutionally in order to uphold the trial court's determination that the Ostranders are the children's de facto parents.  The statute provides, in relevant part, as follows:

> **3. Adjudication of de facto parent status.**  The court shall adjudicate a person to be a de facto parent if the court finds by clear and convincing evidence that the person has fully and completely undertaken a permanent, unequivocal, committed and responsible parental role in the child's life. Such a finding requires a determination by the court that:

**A.** The person has resided with the child for a significant period of time;

**B.** The person has engaged in consistent caretaking of the child;

**C.** A bonded and dependent relationship has been established between the child and the person, the relationship was fostered or supported by another parent of the child and the person and the other parent have understood, acknowledged or accepted that or behaved as though the person is a parent of the child;

**D.** The person has accepted full and permanent responsibilities as a parent of the child without expectation of financial compensation; and

**E.** The continuing relationship between the person and the child is in the best interest of the child.

19-A M.R.S. § 1891(3).

[¶22] Specifically, Martin's argument focuses upon the required findings that "the relationship was fostered or supported by another parent of the child" and that "the person and the other parent have understood, acknowledged or accepted that or behaved as though the person is a parent of the child," 19-A M.R.S. § 1891(3)(C). Martin contends that for the statute to survive constitutional scrutiny, the statutory references to "another parent" and "the other parent" must be read to refer to each and every legal parent. Martin does not challenge the court's findings that the Ostranders proved the other

elements of their de facto parentage claim, such as that they provided residence and care and exercised parental responsibilities for the children, and we agree that the record fully supports those findings.

[¶23]  Martin's argument raises a legal issue and a factual issue.  First, based on our case law explaining that a de facto parentage determination implicates a legal parent's fundamental right to control the care and custody of his or her child, *e.g.*, *Pitts v. Moore*, 2014 ME 59, ¶ 27, 90 A.3d 1169, Martin argues that for the Ostranders to satisfy their burden under section 1891(3)(C), the Ostranders needed to prove that *he*—a presumptively fit legal parent— fostered or supported the children's relationships with the Ostranders and behaved as though the Ostranders were parents of the children, not just that MacMahan did so.  Second, he argues that the record contains insufficient proof to support that finding.[11]

[¶24]  Our task is thus to examine (1) whether, to avoid an unconstitutional result, the statute must be read as Martin contends, and, if so, (2) whether the court's findings are supported by the evidence.  We review the

---

[11]  Martin also argues, for the first time in his reply brief, that there was insufficient evidence to support findings that *MacMahan* fostered or supported the relationship with the Ostranders and behaved as though the Ostranders were parents of the children.  Because Martin has not preserved that argument, we need not address it, *see, e.g.*, *Bayview Loan Servicing v. Bartlett*, 2014 ME 37, ¶ 24, 87 A.3d 741, but we note here that we are not persuaded.

court's findings for clear error, *Kilborn*, 2016 ME 78, ¶ 16, 140 A.3d 461, and we examine questions of constitutional law and statutory interpretation de novo, *In re D.P.*, 2013 ME 40, ¶ 6, 65 A.3d 1216. "If at all possible, we will construe [a] statute to preserve its constitutionality." *Town of Baldwin v. Carter*, 2002 ME 52, ¶ 9, 794 A.2d 62. "Thus, when there is a reasonable interpretation of a statute that will satisfy constitutional requirements, we will adopt that interpretation notwithstanding other possible interpretations of the statute that could violate the Constitution." *Nader v. Me. Democratic Party*, 2012 ME 57, ¶ 19, 41 A.3d 551 (citation omitted).

[¶25] As we have consistently recognized, efforts by persons other than legal parents "to obtain parental rights through litigation, over the objections of parents, implicate the parents' fundamental right[s] to direct the upbringing of their children." *Philbrook v. Theriault*, 2008 ME 152, ¶ 17, 957 A.2d 74; *see Pitts*, 2014 ME 59, ¶¶ 11-12, 17, 24, 27, 90 A.3d 1169; *Rideout v. Riendeau*, 2000 ME 198, ¶ 18, 761 A.2d 291 ("[T]he right to direct and control a child's upbringing is a 'fundamental' liberty interest protected by the Due Process Clause." (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (emphasis omitted))). Because a court's determination that a person is a de facto parent constitutes a "substantial" "intrusion into a [legal] parent's fundamental rights"

that is "no less permanent than the termination of parental rights," we apply strict scrutiny to evaluate whether that interference impermissibly burdens the rights at issue. *Pitts*, 2014 ME 59, ¶¶ 12, 17, 27, 90 A.3d 1169; *see C.L. v. L.L.*, 2015 ME 131, ¶ 22, 125 A.3d 350 ("The creation by a court of an additional, legally recognized parental relationship with a child permanently alters the relationships among the child and the other parents.").

[¶26] When we decided *Pitts v. Moore*, we had previously recognized that our courts could grant parental rights to a person other than a biological or adoptive parent,[12] but neither we nor the Legislature had acted to establish precise standards for such a determination that would account for the exacting scrutiny required. *See Pitts*, 2014 ME 59, ¶¶ 19, 24, 90 A.3d 1169. In a plurality opinion in *Pitts*, we held that a person seeking de facto parentage status must prove by clear and convincing evidence "(1) [that] he or she has undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life, and (2) that there are exceptional circumstances sufficient to allow the court to interfere with the legal or adoptive parent's rights." *Id.* ¶ 27 (quotation marks and citations omitted).

---

[12] *See Stitham v. Henderson*, 2001 ME 52, 768 A.2d 598; *C.E.W. v. D.E.W.*, 2004 ME 43, 845 A.2d 1146; *Young v. Young*, 2004 ME 44, 845 A.2d 1144; *Leonard v. Boardman*, 2004 ME 108, 854 A.2d 869; *Philbrook v. Theriault*, 2008 ME 152, 957 A.2d 74.

[¶27]  Relevant to this case, we explained the first element in more detail, stating,

> We define a "permanent, unequivocal, committed, and responsible parental role" by looking to the elements of de facto parenthood employed in Massachusetts: "A de facto parent is one who has no biological relation to the child [as a parent], but has participated in the child's life as a member of the child's family. The de facto parent resides with the child and, with the consent and encouragement of the legal parent, performs a share of caretaking functions . . . ."

*Id.* ¶ 28 (quoting *E.N.O. v. L.M.M.*, 711 N.E.2d 886, 891 (Mass. 1999)).  "This language," we stated, "gives litigants and courts a list of the necessary elements for determining whether an individual's relationship with a child is permanent, unequivocal, committed, and responsible."  *Id.*  We noted that "the test accounts for the intent of the legal parent and the putative de facto parent to co-parent, as measured before the dissolution of their relationship, or the intent of the legal parent that the non-parent act as parent in place of the legal parent."  *Id.*  In *Kilborn*, 2016 ME 78, ¶ 18, 140 A.3d 461, we reiterated that this element "can be met by demonstrating that . . . a legal parent intended for the nonparent to act in place of the legal parent."  We also made clear that proof that the legal parent "implicitly, if not explicitly, consented to and encouraged" the putative de facto parent's parental role can suffice.  *Id.* ¶¶ 19-21 (quotation marks omitted).

[¶28]  In July 2016, when the Legislature enacted the Maine Parentage Act, it codified these common law standards.  P.L. 2015, ch. 296, § A-1 (effective July 1, 2016); *Libby*, 2020 ME 71, ¶ 16 n.3, 234 A.3d 197 (noting that 19-A M.R.S. § 1891 "codifie[d] the common law principle that a person cannot become a de facto parent unless the child's legal parent recognizes the person as a parent); *Kilborn*, 2016 ME 78, ¶ 1 n.1, 140 A.3d 461 (explaining that section 1891 codified the first element of the two-part test set forth in *Pitts*); L.D. 1017, Enacted Law Summary (127th Legis. 2015) (stating that the statute "codifie[d] the de facto parent doctrine, now firmly established by case law"). Thus, the statute provides that the court must adjudicate a person a de facto parent if it finds by clear and convincing evidence "that the person has fully and completely undertaken a permanent, unequivocal, committed and responsible parental role in the child's life," and it further provides that "[s]uch a finding requires" five enumerated sub-findings,[13] one of which contains the language at issue here: that

> [a] bonded and dependent relationship has been established
> between the child and the person, the relationship was fostered or
> supported by *another parent* of the child and the person and *the*

---

[13]  These are what we described as "the necessary elements" for determining whether a putative de facto parent "has undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life," which is necessary to protect a legal parent's fundamental right to control the upbringing of his or her children.  *Pitts v. Moore*, 2014 ME 59, ¶¶ 27-28, 90 A.3d 1169 (quotation marks omitted).

> *other parent* have understood, acknowledged or accepted that or behaved as though the person is a parent of the child.

19-A M.R.S. § 1891(3)(C) (emphasis added).

[¶29]  In light of this precedent, we conclude that a putative de facto parent must prove the elements of section 1891(3)(C) as to a legal parent who appears[14] and objects to the de facto parentage petition, as Martin has.[15]  *See Davis*, 2018 ME 72, ¶ 20, 186 A.3d 837 ("Given the legislative history of the [Maine Parentage Act], we use the common law that the [Act] later attempted to codify as one way to understand the Legislature's intentions." (footnote omitted)).  We therefore agree with Martin that in order for the court to adjudicate the Ostranders de facto parents of the children, the Ostranders needed to prove that "the relationship was fostered or supported by" Martin and that Martin and the Ostranders "understood, acknowledged or accepted that or behaved as though" the Ostranders were parents of the children. 19-A M.R.S. § 1891(3)(C).  To hold otherwise would potentially allow the unilateral actions of one legal parent to cause an unconstitutional dilution of

---

[14]  The statute requires a person seeking to be adjudicated a de facto parent to serve the initiating pleadings and affidavit "upon all parents and legal guardians of the child and any other party to the proceeding."  19-A M.R.S. § 1891(2)(A) (2021).

[15]  This case does not call on us to decide whether the same requirement applies to legal parents who fail to appear or who appear and do not object.  Nor does it present the issue of what standards apply when an objecting parent has been deemed unfit.

another legal parent's rights. *See E.N. v. T.R.*, 255 A.3d 1, 31 (Md. 2021) ("[T]o declare the existence of a de facto parentship based on the consent of only one [legal] parent . . . undermines and, essentially, negates [any other legal] parent's constitutional right to the care, custody, and control of the . . . children.").[16]

[¶30]  Our conclusion is consistent with Maine's de facto parentage statute, which requires "all parents and legal guardians of the child" to be served with a de facto parentage filing, 19-A M.R.S. § 1891(2)(A), and the law of other states, *see* D.C. Code § 16-831.01(1) (LEXIS through all permanent L. effective as of Nov. 17, 2021) (defining de facto parent to require holding

---

[16] In *E.N. v. T.R.*, the Maryland Court of Appeals articulated its rationale for requiring a showing of consent by all legal parents:

> [I]n addition to infringing on a parent's individual constitutional right to custody and control of his or her child . . . , there are practical concerns attendant to judicially creating a de facto parentship without the consent of both legal parents. Creating a de facto parentship with the consent of only one parent where there are two fit legal parents and in the absence of exceptional circumstances would result in circumstances that may be unworkable for the legal parents, the de facto parent, and the children involved. . . . [T]here will inevitably be circumstances where de facto parenthood is sought by a third party in the absence of exceptional circumstances and with both fit legal parents available and involved in a child's life. Under such circumstances, to permit the consent of just one parent to create a third parent with custodial rights to a child without the consent of the second parent may result in families in Maryland with children being subject to custody and visitation orders between all three or perhaps more fit parents, who have little or no ability to co-parent, and who possibly do not even know each other, a situation that could rarely be seen to be in the best interest of a child.

255 A.3d 1, 40 (Md. 2021) (citation omitted). The court also recognized that "consent" may be "implied" and may be "inferred from a legal parent's conduct" and "shown through action or inaction, so long as the action or inaction is knowing and voluntary and is reasonably understood to be intended as that parent's consent to and fostering of the third party's formation of a parent-like relationship with the child." *Id.* at 34.

22

oneself out as a parent "with the agreement of the child's parent or, if there are 2 parents, both parents"); *E.N.*, 255 A.3d at 30-32.[17]

[¶31]  Importantly, however, section 1891(3)(C) does not require proof that every legal parent has given express consent to the de facto parent relationship.  If such consent were required, there could be no litigation of any de facto parentage claim because a legal parent's objection would necessarily defeat the claim.  Rather, the proof that section 1891(3)(C) requires is that the legal parent or parents have recognized, accepted, and supported the formation and growth of "[a] bonded and dependent relationship" between the putative de facto parent and the child, 19-A M.R.S. § 1891(3)(C).  *See Kilborn*, 2016 ME 78, ¶¶ 18-20, 140 A.3d 461; *Pitts*, 2014 ME 59, ¶ 28, 90 A.3d 1169; *Young v. King*, 2019 ME 78, ¶¶ 9-12, 208 A.3d 762.  A person seeking de facto parentage status can satisfy the section 1891(3)(C) burden by demonstrating

---

[17]  Although we have not had occasion to address the issue directly before, our conclusion is also consistent with our own decisions.  In *Kilborn v. Carey*, in affirming a de facto parentage determination on the merits before Maine's de facto parentage statute became effective, we addressed separately whether sufficient evidence existed to support the trial court's findings that *each* legal parent fostered and supported the relationship with the de facto parent.  2016 ME 78, ¶¶ 18-21, 140 A.3d 461.  Until this case, our de facto parentage decisions under the statute addressed only issues of standing.  *See Libby v. Estabrook*, 2020 ME 71, ¶ 1, 234 A.3d 197; *In re Child of Philip S.*, 2020 ME 2, ¶ 1, 223 A.3d 114; *Young v. King*, 2019 ME 78, ¶ 1, 208 A.3d 762; *Lamkin v. Lamkin*, 2018 ME 76, ¶ 1, 186 A.3d 1276; *Davis v. McGuire*, 2018 ME 72, ¶ 1, 186 A.3d 837.  In some of those decisions, however, we affirmed the dismissal of a de facto parentage petition for lack of standing because one legal parent had not fostered and supported the relationship or acknowledged the putative de facto parent as a parent, and we did so without considering whether any other legal parent had fostered or supported the putative de facto parenting relationship.  *See Davis*, 2018 ME 72, ¶¶ 10, 30, 32, 186 A.3d 837; *In re Child of Philip S.*, 2020 ME 2, ¶¶ 3, 9, 22, 223 A.3d 114.

that the child's legal parent or parents have implicitly, through acts or omissions if not through words, fostered, supported, and accepted the person's parental role. *Kilborn*, 2016 ME 78, ¶¶ 18-21, 21 n.6, 140 A.3d 461; *Young*, 2019 ME 78, ¶ 10, 208 A.3d 762.

[¶32]  Here, the trial court found, contrary to Martin's testimony, that at least by April 2016, Martin knew or should have known that the children were living with the Ostranders and that he "abdicated his financial and personal responsibility to care for the children."  *See* Principles of the L. of Fam. Dissolution: Analysis and Recommendations § 2.03 cmt. c (Am. L. Inst. 2002) (explaining that a de facto parent relationship may form without the agreement of "[t]he legal parent or parents" where there is "a complete failure or inability of any legal parent to perform caretaking functions," such as "when a parent is absent, or virtually absent, from the child's life"); *In re Parentage of J.B.R.*, 336 P.3d 648, 653-54 (Wash. Ct. App. 2014) (concluding that a trial court did not err in finding that a parent "consent[ed] to and foster[ed] a relationship" with a de facto parent by "voluntarily absent[ing] himself from his child's life"). Martin's pervasive failure to exercise either his parental rights or his parental responsibilities illustrates the principle that a legal parent's omissions or

absence may create a vacuum in terms of care and nurture that is filled by the de facto parent relationship. *See Libby*, 2020 ME 71, ¶ 16, 234 A.3d 197.

[¶33] The court's findings regarding Martin's abdication of his rights and responsibilities are amply supported by the evidence in the record and they are sufficient to support the determination that Martin—at least implicitly—understood and accepted that the Ostranders were fulfilling parental roles for his children. The record evidence went beyond mere omissions on Martin's part and included his testimony that he voiced affirmative support for the Ostranders' de facto parentage relationship with the children when he expressed his appreciation to them for "raising [his] girls," and also that he took an affirmative step to foster the relationship when he granted them temporary legal authority over the children. It is true that Martin's motion to modify reflected a step toward asserting his own parental rights, but given the evidence of commitments made but not kept on his part, it did not detract from the record evidence supporting the court's findings in favor of the Ostranders. *See Sulikowski v Sulikowski*, 2019 ME 143, ¶ 14, 216 A.3d 893 ("The trial court is the sole arbiter of witness credibility and it is therefore free to accept or reject portions of the parties' testimony based on its credibility determinations and to give their testimony the weight it deems appropriate." (citation omitted));

*Handrahan v. Malenko*, 2011 ME 15, ¶ 14, 12 A.3d 79 ("A court is not required to believe the testimony of any particular witness, . . . even when the witness's testimony is uncontradicted." (quotation marks and citations omitted)).

## C.    Martin's Motion to Modify the Divorce Judgment

[¶34]  Martin also challenges the court's denial of his request, made via his motion to modify the divorce judgment, for sole parental rights and for the children to live primarily with him in Kansas. *See* 19-A M.R.S. § 1657(1) (2021). "We review an order on a post-divorce motion for an abuse of discretion or error of law and review factual findings contained therein for clear error." *Lewin v. Skehan*, 2012 ME 31, ¶ 24, 39 A.3d 58.  "[O]nly a substantial change in circumstances since the entry of the most recent decree can justify the modification of the decree, and . . . the overriding consideration whenever a proposed modification is sought is the best interest[s] of the minor children." Levy, *Maine Family Law* § 6.6[1] at 6-61 (8th ed. 2013) (quotation marks omitted).

[¶35]  We do not agree with Martin that the court acted outside its discretion when it declined to find that Martin had demonstrated a change in circumstances—since the entry of the divorce judgment in January 2018—that was substantial enough to justify the modifications he sought.  *See Smith v.*

*Rideout*, 2010 ME 69, ¶¶ 15-18, 1 A.3d 441; *Villa v. Smith*, 534 A.2d 1310, 1312 (Me. 1987) (explaining that the trial court has broad discretion to determine whether a change in circumstances has affected the children's best interests to a degree significant enough to justify a change of primary custody). The court thoroughly examined the children's best interests in its consolidated order and determined that those interests would be served by continued residence primarily with the Ostranders and shared parental rights. It did not err or abuse its discretion when, in accordance with those supported findings, it declined Martin's request for sole parental rights and primary residence.

**D.    Conclusion**

[¶36]  We affirm the judgment granting the Ostranders parental rights and vacate the judgment amending the divorce judgment for three reasons. First, to the extent that the trial court erred by "adopt[ing]" the magistrate's interim findings, the error was harmless. Second, although the Ostranders were required to prove that Martin—as a legal parent objecting to the Ostranders' de facto parentage petition—"fostered or supported" the Ostranders' parental role and "understood, acknowledged or accepted that [role] or behaved as though the" Ostranders were the children's parents, 19-A M.R.S. § 1891(3)(C), the court did not err when it determined that the

Ostranders had sustained their burden. Finally, because the court's amended divorce judgment does not provide that the children's primary residence is to be with the Ostranders, we vacate the judgment amending the divorce judgment and remand to allow the court to remedy that remaining inconsistency.

The entry is:

> The judgment establishing de facto parentage, parental rights and responsibilities, and child support is affirmed. The judgment amending the divorce judgment is vacated. The matter is remanded for the trial court to enter a new amended divorce judgment that is consistent with the judgment establishing parental rights and responsibilities and provides that the children's primary residence shall be with the Ostranders.

---

E. Anne Carton, Esq., Brunswick, and Matthew C. Garascia, Esq. (orally), Auburn, for appellant Mark R. Martin

John F. Zink, Esq. (orally), Freeport, for appellees Dawn and James Ostrander

Vanessa A. Bartlett, Esq., Law Offices of Vanessa A. Bartlett, Portland, for appellee Marylou E. MacMahan

West Bath District Court docket numbers FM-2017-186; FM-2018-340'
FOR CLERK REFERENCE ONLY